Beatrice Mae HANSEN, et al.,
Plaintiffs-Appellees,

v.

JOHNS–MANVILLE PRODUCTS COR-
PORATION, et al., Defendants,

Johns-Manville Sales Corporation,
Defendant-Appellant.

No. 82–2276.

United States Court of Appeals,
Fifth Circuit.

June 11, 1984.

Rehearing and Rehearing En Banc
Denied Sept. 12, 1984

Ervin A. Apffel, Jr., Otto D. Hewitt, James L. Ware, Galveston, Tex., Michael D. Taber, Denver, Colo., for defendant-appellant.

Atreus M. Clay, Mike N. Cokins, Houston, Tex., for plaintiffs-appellees.

Before RUBIN and RANDALL, Circuit Judges, and SEAR *, District Judge.

RANDALL, Circuit Judge:

Johns-Manville Sales Corporation and Johns-Manville Products Corporation (collectively "Johns-Manville") appeal a jury verdict awarding compensatory and punitive damages to the widow of Andrew Hansen, a former shipyard worker, for wrongful death caused by exposure to Johns-Manville asbestos products. We affirm as to liability, but remand to the district court to order a remittitur or a new trial at the option of the plaintiff.

I.

Andrew Hansen ("decedent") began working for Todd Shipyards in 1940 as a pipefitter, tearing out old insulation in ships and installing new insulation. During his employment, decedent worked primarily with products containing asbestos[1]

---

* SEAR, District Judge of the Eastern District of Louisiana, sitting by designation.

1. Asbestos is the name of a group of naturally occurring fibrous minerals known for their properties of relative indestructibility and resistance to heat and fire. During World War II, the protective clothing, insulation and shipbuilding industries created a dramatic increase in the demand for asbestos. Once considered harmless, asbestos is now regarded as one of the most dangerous of all natural minerals. *See* Special Project, *An Analysis of the Legal, Social,*

that were manufactured by Johns-Manville. Decedent suffered a serious ankle injury in 1976 and retired due to that injury.

In 1978, at age 65, decedent developed chest problems. He was ultimately diagnosed as suffering from asbestosis and mesothelioma, both of which are caused by exposure to asbestos.[2] Thirteen months later, he died.

Decedent's widow ("Hansen") filed suit against Johns-Manville and thirteen other defendants in 1979. Hansen alleged causes of action based upon strict liability for the manufacture of the asbestos-containing insulation and upon negligence for failure to adequately test and inspect, and for failure to warn. Prior to trial, all defendants, except Johns-Manville, were non-suited on Hansen's motion. A jury trial was then held. The jury returned answers to special interrogatories finding for Hansen on all counts and awarded Hansen $260,000 for loss of care and services, $800,000 for decedent's anguish and pain and suffering, and $1,000,000 in punitive damages. Judgment in the amount of $2,060,000 was entered by the district court on May 11, 1982. Johns-Manville's motions for judgment n.o.v., remittitur, and new trial were denied. Johns-Manville appeals.

## II.

On appeal, Johns-Manville raises twelve distinct issues relating to evidence submitted at trial, interrogatories submitted to the jury, the various post-judgment motions, and the award of punitive damages. We will address each of these issues in turn.

*and Political Issues Raised by Asbestos Litigation,* 36 Vand.L.Rev. 573 (1983).

**2.** Parenchymal asbestosis is the earliest known and most common asbestos-related disease. In some cases, asbestosis may become manifest within ten years of the date of initial exposure. In general, asbestosis manifests itself between ten and twenty-five years after initial exposure. Inhalation of asbestos fibers initiates a scarring process that destroys air sacs in healthy lung tissue. The result is a decrease in pulmonary function and lung volume. Symptoms include shortness of breath, coughing, chest pains and

*Deposition Testimony of Dr. Kenneth Smith.*

■ Johns-Manville asserts that the trial judge erred in admitting the deposition testimony of Dr. Kenneth Smith, former medical officer of Johns-Manville, because no proper foundation was laid showing the nature of his employment at the time of the deposition, the course of his knowledge, or his authority to speak for the company. *See generally* H. Wigmore, *Evidence* § 654 (3d ed. 1940). This argument is without merit. Dr. Smith's deposition clearly reveals the nature of his medical practice at the time of the taking of the deposition. As to the course of his knowledge, Dr. Smith's deposition relates his educational background and the fact that he served as Medical Director of Johns-Manville until 1966. Finally, since Dr. Smith was not testifying as an agent for Johns-Manville, authority to speak as an agent was not required. Dr. Smith's deposition was properly admitted.

*The "Sumner Simpson" Papers.*

Johns-Manville contends that the district court erred in admitting into evidence several documents from the "Sumner Simpson" papers. These papers consist of various correspondence, surveys and memoranda compiled by Sumner Simpson, the President and later Chairman of the Board of Raybestos Corporation ("Raybestos"), and discovered after his death. Raybestos, like Johns-Manville, employed asbestos in its products. Several documents from the collected papers were admitted into evidence to show that Johns-Manville knew of the alleged dangers of asbestos prior to 1964

clubbing of fingers. The disease is not always fatal, but it is progressive and incurable.

Mesothelioma is a malignant tumor in the membrane lining of the lungs, chest cavity and abdominal cavity which metastizes quickly and is generally fatal. Unlike asbestosis, no relationship between the degree of exposure to asbestos and development of the disease has been established. Mesothelioma has developed in individuals exposed to minimal quantities of asbestos. *See* Comment, *Asbestosis: Who Will Pay the Plaintiff?,* 57 Tul.L.Rev. 1491, 1491–93 (1983); Special Project, *supra* note 1, at 579.

and thus was negligent and grossly negligent in failing to warn of those dangers. Johns-Manville objects to the admission of these documents on the grounds that the papers were not authenticated, that they were hearsay and not within any exception, and that they are irrelevant to any issue in the case.

In a similar case decided recently by this court, *Jackson v. Johns-Manville Sales Corp.*, 727 F.2d 506 (5th Cir.1984), we held that the district court erred in admitting three letters from the Sumner Simpson papers, including one admitted in the present case, on the ground that they were relevant to no issue in the case. We determined that, because the letters introduced concerned studies having to do with workers in asbestos mines, they were irrelevant to the issue of the defendants' knowledge of dangers regarding insulation workers. We need not decide, however, whether admission of the Sumner Simpson papers was erroneous in this case, for even assuming, *arguendo*, that such admission was error, we find that, on the record presented in this case, it was harmless error.

 The Sumner Simpson papers were introduced in this case to show that Johns-Manville knew or should have known of the dangers of asbestos to shipyard workers and insulators prior to 1964 and thus, that Johns-Manville had a duty to warn of that danger. However, Hansen presented other evidence, particularly the testimony of Dr. Smith,[3] which would show that Johns-Man-

ville knew of the dangers of asbestos to insulation workers well before 1964. Thus, the introduction of the Sumner Simpson papers was merely cumulative. It is well settled that the improper admission of evidence that is merely cumulative on matters shown by other admissible evidence is harmless error. *Coughlin v. Capitol Cement Co.*, 571 F.2d 290, 307 (5th Cir.1978). Thus, even if the district court erred in admitting the Sumner Simpson papers in this case, an issue that we expressly do not decide, it was harmless error.

*Punitive Damages/Gross Negligence.*

 Johns-Manville raises several issues with regard to the jury's finding of gross negligence and award of punitive damages. Under Texas law, a plaintiff is entitled to punitive damages upon a showing of gross negligence, i.e., that the defendant was consciously, knowingly indifferent to the plaintiff's welfare and safety. *Maxey v. Freightliner Corp.*, 665 F.2d 1367, 1374 (5th Cir.1982). Johns-Manville argues that the potential for overkill in the award of punitive damages in mass products liability situations such as this[4] is inconsistent with the underlying policy objectives of both strict liability and punitive damages. Johns-Manville also argues that it has been subjected to repeated awards of punitive damages, thus unconstitutionally subjecting it to double jeopardy. Johns-Manville further argues that the district court erred in denying its motions for directed verdict,[5]

---

**3.** Dr. Smith testified that he told Johns-Manville of the dangers asbestos presented to insulation workers as early as the 1940s.

**4.** Approximately 30,000 individual plaintiffs have filed suits against asbestos manufacturers since 1973, and industry experts predict that plaintiffs will file an additional 500 suits each month. The potential liability of Johns-Manville alone for compensatory damages alone has been estimated to exceed $2 billion. On August 26, 1982, Johns-Manville filed for Chapter 11 reorganization, claiming that the exposure it faced in asbestos litigation threatened its solvency and, ultimately, its viability. In support of its claim, Johns-Manville pointed out that in 1981 and the first half of 1982 litigation had resulted in ten punitive damage verdicts against

it at an average of $616,000 per verdict. In re *Johns-Manville Corp.*, No. 82 B (S.D.N.Y. petition filed August 26, 1982). *See generally* Special Project, *supra* note 1, at 691.

**5.** Johns-Manville presents this argument as "[t]he trial court erred in submitting special interrogatory no. 8 (having to do with gross negligence) because there was no evidence to support its submission." Because Johns-Manville is arguing that the issue should not have been submitted to the jury because of insufficient evidence, this argument is more properly addressed to the district court's denial of Johns-Manville's motion for directed verdict. We will treat it as such. Subsequent issues that were similarly presented will be treated as appeals from the denial of a directed verdict as well.

judgment n.o.v., and new trial with regard to gross negligence and punitive damages.

■ In *Jackson v. Johns-Manville Sales Corp., supra,* we held that Mississippi substantive law would disallow punitive damages in asbestos products liability actions. In *Jackson,* the plaintiff, who had contracted asbestosis, brought a products liability action against Johns-Manville and Raybestos-Manhattan, Inc. After the jury returned a verdict in favor of the plaintiff and awarded actual and punitive damages, the defendants appealed. A panel of this court disallowed the punitive damages awarded, holding that Mississippi substantive law would disallow such awards in a similar situation, because in the extraordinary circumstances in which asbestosis litigation is set, the allowance of punitive damages is incompatible with the objectives of and would disrupt the viability of the strict liability cause of action. Finding that strict liability in Mississippi "seeks not merely to assure compensation for the individual plaintiff, but to achieve the broader societal objective of equitable loss distribution," the *Jackson* panel determined that the presence of a viable enterprise is essential to the maintenance of effective loss distribution in strict liability. Because of the number of similar suits already filed, asbestos defendants face repeated assessments of punitive damages that threaten to exhaust their resources. Therefore, the panel determined that, at the point at which awards of punitive damages destroy the viability of the enterprise, the remedy of punitive damages becomes antithetical to the policy of strict liability and thus, that punitive damages must not be allowed. Furthermore, the panel found that the basic policy objectives of punitive damages—

punishment and deterrence—are satisfied by multiple exposure to compensatory damages. Johns-Manville presents similar arguments in the present case, urging that the very attributes of the Mississippi law of strict liability that prompted the *Jackson* panel to find that Mississippi law would disallow punitive damages in this type of case are present in Texas law as well. Thus, Johns-Manville argues, this panel should follow the panel decision in *Jackson.*

Following a review of the relevant decisions of the Texas courts, we find that we are unable to follow *Jackson* in this case. At least one Texas court has said that punitive damages may be recovered under Article 16, Section 26 of the Constitution of the State of Texas[6] in a strict liability action for the death of the user of a defective product. *Heil Co. v. Grant,* 534 S.W.2d 916, 926 (Tex.Civ.App.—Tyler 1976 writ ref'd n.r.e.) ("We believe that exemplary damages may be recovered under [Tex. Const. art. 16, section 26] in a strict liability action for the death of the user of a defective product."); *see also Maxey v. Freightliner Corp.,* 665 F.2d 1367, 1371–72 & n. 4 (5th Cir.1982).[7] To be sure, *Heil* did not involve a mass products liability situation such as the one facing this court in *Jackson* and in the present case. However, to the extent that punitive damages are guaranteed to claimants by the Texas Constitution, such a fact is irrelevant; article 16, section 26 does not distinguish between mass torts and singular torts. We also recognize that the above-referenced language in *Heil* is dicta. But, while it is not definitively settled that punitive damages are guaranteed by the Texas Constitution in strict liability actions for the death of a

**6.** Article 16, section 26 provides:
Every person, corporation, or company, that may commit a homicide, through a wilful act, or omission, or gross neglect, shall be responsible, in exemplary damages, to the surviving husband, widow, heirs of his or her body, or such of them as there may be....
Tex. Const. art. 16, section 26.

**7.** In *Maxey,* we were presented with the argument that, as a matter of law, punitive damages are not available in products liability cases in

Texas. Noting the language of *Heil,* we said: "Absent some reason to believe that the Texas courts, when presented with the question, will erect such a bar to recovery of exemplary damages, which otherwise are guaranteed by the Texas Constitution, this Court is reluctant to do so." 665 F.2d at 1371 n. 4. There have been no such indications from the Texas courts within the intervening two years that would convince us to depart from our conclusion in *Maxey.*

user of a defective product, the *only* suggestion we have from the Texas courts is that there is, indeed, such a right. Absent a clear indication from the Texas courts to the contrary, we are *Erie*-bound not to dictate otherwise. Accordingly, we find no basis upon which to hold that Texas courts would disallow punitive damages in a case such as this.[8]

■ Johns-Manville next contends that the award of punitive damages in mass tort cases is unconstitutional because punitive damages are analogous to criminal penalties. Thus, Johns-Manville argues that the constitution requires assurance against multiple, unrestrained punishments in the form of punitive damages. In essence, Johns-Manville is arguing that it is being subjected to double jeopardy.

The fifth amendment guarantee against double jeopardy, applicable to the states through the fourteenth amendment, protects against multiple punishments for the same offense. *North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969). However, the jeopardy to which the fifth amendment refers is not present in proceedings that are not "essentially criminal." *Breed v. Jones,* 421 U.S. 519, 528, 95 S.Ct. 1779, 1785, 44 L.Ed.2d 346 (1975). In *Breed,* the Supreme Court faced the question of whether juvenile proceedings are "essentially criminal" for purposes of the double jeopardy prohibition. In finding that juvenile proceedings are "essentially criminal," the Court relied upon the purpose of the proceeding, the potential consequences, and the fact that the action was brought by and backed by the resources of the state. The Court found that the purpose of the juvenile proceeding was to determine whether the defendant had committed acts that violate a criminal law. The possible consequences

of the proceeding were the stigma inherent in the determination of a criminal violation and the deprivation of liberty for many years.

■ Based upon *Breed,* we determine that punitive damages awarded in a private lawsuit by an individual plaintiff are not part of an "essentially criminal" proceeding and, thus, do not fall within the purview of the prohibition against double jeopardy. A jury's determination that a homicide has occurred as a result of gross negligence necessary to award punitive damages is not a determination that a criminal law has been violated. Moreover, that determination does not carry with it the consequences that the *Breed* Court found necessary for an "essentially criminal" proceeding. While Johns-Manville will be deprived of property, it will not suffer the stigma normally accompanying criminal proceedings. Thus, the consequences that attend the type of proceeding involved here are not of the variety that the Court has recognized as rising to the level of requiring protection against double jeopardy. Perhaps more importantly, this is not an action brought by the state, but one brought by a private individual. We have uncovered no cases, and Johns-Manville points us to none, in which a court has afforded double jeopardy protection as to any proceeding that was not initiated by the state. Accordingly, we do not find that Johns-Manville has been subjected to double jeopardy in violation of the fourteenth amendment.

■ Johns-Manville next contends that the district court erred in denying its motion for directed verdict and motion for judgment n.o.v. with relation to gross negligence and punitive damages. The propriety of a district court's denial of a directed

8. In addition to the Texas constitutional provision, there is another factor which distinguishes *Jackson* and Mississippi law from the present case and Texas law. *Jackson* did not involve an action for wrongful death, but was instead an action for personal injury. While the Texas Supreme Court has yet to address the issue, at least one Texas appellate court has upheld an award of punitive damages in a products liabili-

ty action for personal injury which did not involve wrongful death. *Rawlings Sporting Goods Co. v. Daniels,* 619 S.W.2d 435 (Tex.Civ. App.—Waco 1981, writ ref'd n.r.e.). Thus, there is some suggestion that the Texas courts may allow punitive damages in products liability actions even in cases not covered by article 16, section 26, an issue which we need not decide in this case.

verdict or judgment n.o.v. is measured by the standard set by this court in *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir.1969) (en banc):

> If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury.

On appeal, the court is to view all the evidence with all reasonable inferences most favorable to the nonmoving party. *Campbell v. Bowlin*, 724 F.2d 484, 489 (5th Cir.1984). Thus, the question before this court on appeal is whether there was sufficient evidence concerning Hansen's allegations of gross negligence to present a jury question.

Gross negligence is defined under Texas law as "that entire want of care which would raise the belief that the act or omission complained of was a result of a conscious indifference to the right or welfare of the person ... affected by it." *Missouri Pacific Railroad Co. v. Shuford*, 72 Tex. 165, 10 S.W. 408, 411 (1888); *see also Maxey v. Freightliner Co., supra*, at 1372; *Burk Royalty Co. v. Walls*, 616 S.W.2d 911 (Tex.1981). Punitive damages may be awarded upon a showing of gross negligence. Johns-Manville argues that it submitted evidence that showed that it made efforts to inspect its products and to participate in safety studies; that it began to issue warnings with its asbestos-containing products in 1964, as soon as scientific evidence was available that proved a relationship between those products and asbestosis; and that it developed an asbestos-free replacement in 1971. This evidence, Johns-Manville argues, represents strange behavior for a defendant who allegedly was wil-

fully, intentionally and consciously indifferent to decedent's rights, welfare and safety. However, although much evidence in favor of Johns-Manville was developed at trial, the question confronting this court is not whether this court as a trier of fact would decide the issue in favor of one side or the other, but whether there was sufficient evidence in support of Hansen's claim to present a jury question. We hold that there was. Hansen presented the testimony of Dr. Smith, a former medical officer of Johns-Manville. Dr. Smith testified that he informed Johns-Manville of the hazards asbestos presented to asbestos insulation workers and recommended placing warnings on insulation products as early as the 1940s, but that Johns-Manville did not act on his recommendations. We believe that this evidence is sufficient to present a jury question. If the jury believed the testimony of Dr. Smith, they could reasonably find that Johns-Manville had been grossly negligent in failing to warn Hansen of the dangers related to its products. It is the function of the jury, not the court, to determine the credibility of witnesses. *Boeing Co. v. Shipman, supra*, at 375. Accordingly, we hold that the district court properly denied Johns-Manville's motion for a directed verdict and motion for judgment n.o.v. with relation to gross negligence and punitive damages.

Johns-Manville also argues that the district court erred in denying its motion for a new trial with relation to gross negligence and punitive damages, alleging that the jury's answers to special interrogatories were against the great weight of the evidence. On a motion for new trial, the trial judge is free to weigh the evidence and may grant a new trial if he believes the verdict is contrary to the weight of the evidence. *United States v. An Article of Drug ... 4,680 Pails*, 725 F.2d 976, 989–90 (5th Cir.1984). However, as an appellate court, our review of the denial of a new trial is severely limited; we may interfere only when the trial court abuses its discretion or fails to exercise it. *Id.; Bazile v. Bisso Marine Co.*, 606 F.2d 101 (5th Cir.

1979). Thus, we review the denial of a motion for new trial based on insufficiency of the evidence only to determine whether there was an "absolute absence of evidence to support the jury's verdict." *Dunn v. Sears, Roebuck & Co.*, 639 F.2d 1171, 1175 (5th Cir.1981). We do not find such an "absolute absence" in this case.

### Negligent Failure to Test.

 Johns-Manville next argues that the district court erred in refusing to grant a directed verdict on Hansen's claim of negligent failure to test and inspect its asbestos products.[9] Johns-Manville asserts that the record is awash with evidence of its efforts to test and inspect its products, and its participation as early as 1929 in studies regarding asbestos-containing products. Johns-Manville points specifically to evidence that shows that it supported, funded, and provided personnel for the *Selikoff* studies, funded the *Lanza* studies, participated in the *Trudeau* studies, was a funding sponsor of the *Brayn-Truan* studies, and helped fund the *Vorwall* studies. However, each of these studies was conducted after the products were already on the market, and thus this evidence does not go to the central inquiry of the issue submitted to the jury—whether Johns-Manville was negligent in failing to test and inspect its asbestos products *before making them available on the market.*[10] Thus, we find that sufficient questions were raised by the evidence as to whether Johns-Manville tested its products within the *relevant* time frame to submit the issue to the jury. *See Borel v. Fibreboard Paper Products Corp.*, 493 F.2d 1076, 1090–91 (5th Cir. 1973) (manufacturer has duty to inspect and test product prior to putting product on market).

### Government Specification Defense.

Johns-Manville requested that the trial judge submit the following instruction and special interrogatory to the jury:

Where the United States Government, or an agency of the United States Government, requires that a product be manufactured and sold in conformity with governmental specifications, a manufacturer may rely upon the specifications in the manufacture and sale of its product; a manufacturer or seller is not liable for conduct arising out of the conformity of its products with such governmental specifications.

Do you find from a preponderance of the evidence that the Defendant manufactured and sold, in accordance with United States governmental specifications, the asbestos containing products of Defendant which were a producing, (proximate) cause of Andrew Hansen's injury?

The trial judge refused to give the requested instruction and to submit the special interrogatory.

In federal court, "a litigant is entitled to have the jury instructed as to his claims and theories of law if they are legally correct, supported by the evidence, and are brought to the court's attention in a timely request." *Corey v. Jones*, 650 F.2d 803, 806 (5th Cir.1981). Johns-Manville contends that the district court's refusal to instruct the jury was error because "government specification" is a defense in an asbestosis case and the evidence in the record supported submission of the issue to the jury. We do not agree.

 The government specification defense has three elements: establishment of product specifications by the government, manufacture in accordance with those specifications, and government

---

9. *See supra* note 4.

10. The special interrogatory submitted to the jury inquired:

Do you find from a preponderance of the evidence that on the occasion in question the defendant was negligent

\* \* \* \* \* \*

(c) in failing to test and inspect its asbestos products to discover the dangerous propensities of such products before making them available in the market.

knowledge equal to that of the manufacturer of the hazards. *In re Agent Orange Product Liability Litigation*, 506 F.Supp. 762, 792–96 (E.D.N.Y.1980). The rationale behind the defense is an extension of sovereign immunity: in circumstances in which the government would not be liable, private contractors who act pursuant to government directives should not be liable. *Id.* Johns-Manville, citing three unpublished opinions from the Western District of Washington, contends that this defense is available to manufacturers in asbestos cases.

 Johns-Manville has cited no cases in which Texas courts have recognized a "government specification" defense; nor has it cited us to any cases that suggest that Texas courts would adopt such a theory. Absent some reason to believe that the Texas courts, when presented with the question, would adopt such a defense, we are unwilling to do so. Moreover, even were we to adopt such a defense, we do not believe that it would apply in this case. Todd Shipyards, Hansen's employer, performed work under government contract for only five of Hansen's twenty-six years of employment. We do not think that the defense would apply in these circumstances. Accordingly, we hold that the district court did not err in refusing the requested instruction and interrogatory.

*Refusal of Instruction as to Taxability of Damage Awards.*

 Johns-Manville requested that the district court instruct the jury that damage awards are not subject to federal taxation. The district court refused. Johns-Manville asserts that this refusal was error. We do not agree. This case is brought under Texas law, and that law applies to the question whether such an instruction was warranted. *Croce v. Bromley Corp.*, 623 F.2d 1084, 1097 (5th Cir.1980). Texas law explicitly disapproves of such an instruction because it introduces a collateral matter into the damage issue. *Missouri-Kansas-Texas R.R. Co. v. McFer-*

*rin*, 156 Tex. 69, 291 S.W.2d 931, 945 (1956); *Caterpillar Tractor Co. v. Gonzales*, 599 S.W.2d 633 (Tex.Civ.App.—El Paso 1980, writ ref'd n.r.e.). Johns-Manville's reliance upon *Norfolk & Western Railway Co. v. Liepelt*, 444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980), and *Gulf Offshore Co. v. Mobil Oil Corp.*, 628 S.W.2d 171 (Tex.App.—Houston [14th Dist.] 1982, writ ref'd n.r.e.), in an attempt to show a "trend" in Texas courts to allow such instructions is misplaced. The Supreme Court, in *Liepelt*, directed such instructions in suits brought under the Federal Employers' Liability Act; *Gulf Offshore* was a case brought under Louisiana substantive law. Thus, both cases are inapposite to this case, brought under Texas law. The district court properly refused to give the requested instruction.

*Denial of Motion for New Trial Based Upon Juror Misconduct.*

 During *voir dire*, all jurors were asked whether they or their family had previously worked with or around asbestos products. Johns-Manville contends that one juror concealed the fact that he had worked as a pipefitter while in the Navy and that, in that job, he had worked with asbestos products. Johns-Manville contends that this juror had done the same type of work as decedent had performed and that he was aware that he had worked around asbestos. Johns-Manville maintains that, had it known of this juror's work with asbestos-insulated pipes, it would have excluded him as a juror. Johns-Manville's motion for a new trial based on jury misconduct was denied.

We review the denial of a motion for new trial for abuse of discretion. *Bunch v. Walter*, 673 F.2d 127 (5th Cir.1982). We do not find that the district court abused its discretion in this case. Johns-Manville's allegations concerning jury misconduct arise out of a court-approved tape recorded conversation between Johns-Manville's counsel and the juror. After carefully reviewing the transcript of that conversation, we are convinced that there was no jury

misconduct and that Johns-Manville's allegations are meritless. The juror stated that he was in the Navy during the Korean conflict and that he was classified as a pipefitter, but that his job was more properly characterized as a general handyman. Most of the pipefitting work was done on shore by others; his pipefitting work consisted of necessary repairs at sea and as to those he said, "I can't even really recall occasions of having that kind of problems." When asked if he ever installed or tore out insulation, the juror replied that he had never even seen any insulation on board ship. Finally, when asked if whether, in his work as a pipefitter, he ever had occasion to do any work with asbestos insulation on pipes, he answered, "if that was the type of covering." The juror's answer thus indicates that he had no prior knowledge of working with asbestos. We find that the district court did not abuse its discretion in denying Johns-Manville's motion for a new trial.

*Refusal To Grant a Remittitur.*

■ The jury awarded Hansen $260,000 in damages for the loss of her husband's care and services; $800,000 for the decedent's pain and suffering; and $1,000,000 in punitive damages. Johns-Manville moved for remittitur, which the trial court denied. On appeal, Johns-Manville asserts that the district court erred in refusing its motion.

We have recently summarized the scope of this court's review in cases in which remittitur is urged:

> The jury's award is not to be disturbed unless it is entirely disproportionate to the injury sustained. We have expressed the extent of distortion that warrants intervention by requiring such awards to be so large as to "shock the judicial conscience," "so gross or inordinately large as to be contrary to right reason," so exaggerated as to indicate "bias, passion, prejudice, corruption, or other improper motive," or as "clearly exceed[ing] that amount that *any* reasonable man could feel the claimant is entitled to." Nonetheless, when a jury's

award exceeds the bounds of any reasonable recovery, we must suggest a remittitur ourselves or direct the district court to do so. Our power to grant a remittitur is the same as that of the district court. We determine the size of the remittitur in accordance with this circuit's "maximum recovery rule," which prescribes that the verdict must be reduced to the maximum amount the jury could properly have awarded.

*Caldarera v. Eastern Airlines, Inc.,* 705 F.2d 778, 784 (5th Cir.1983) (footnotes omitted).

We turn first to the jury's award of $260,000 to Hansen for care, services, advice, counsel and contributions of a pecuniary value that decedent would have provided but for his death. Johns-Manville asserts that the award of $260,000 is excessive because decedent was retired, had no plans to go back to work, and the only "services" he performed were driving the car and keeping the checkbook. Hansen points out that she does not drive and that she was totally dependent upon decedent to take her wherever she wanted to go. She argues that this service along with that of keeping the checkbook, as well as the care, advice, counsel and attention that decedent provided, warrants the jury's award.

Selecting a value to place upon such items as care, advice, counsel, protection and attention is a difficult task. However, the very purpose of an action for wrongful death is to fix damages in money for what cannot be measured in money's worth. Thus, as we noted in *Caldarera, supra:*

> Unless we are to accept any verdict, in whatever amount, as a legally acceptable measure, we must review the amount a jury or a trial court awards. Reassessment cannot be supported entirely by rational analysis. It is inherently subjective in large part, involving the interplay of experience and emotions as well as calculation. The sky is simply not the limit for jury verdicts, even those that have been once reviewed.

705 F.2d at 784. Considering these somewhat subjective factors combined with the

pecuniary value of the household services that the decedent performed, we agree with Johns-Manville that the jury verdict was excessive. The sum of $260,000 for care and services is substantially greater than any we have discovered in other reported cases.[11] We consider that the maximum verdict for care and services over the thirteen year life expectancy of decedent that the district court should have permitted to stand, without remittitur, was $40,000.

We similarly determine that the jury's award of $800,000 for pain and suffering was contrary to reason. Decedent's symptoms began to manifest themselves in May, 1978; he died thirteen months later. During most of this thirteen month period, decedent was on pain medication. While the evidence showed that decedent suffered some pain despite the medication and that he suffered mental anguish as well, we find that $800,000 is excessive.[12] Accordingly we consider that the maximum verdict for pain and suffering that the trial court should have let stand, on this record, was $250,000.

We turn next to the jury's award of punitive damages. Under Texas law, "the amount of exemplary damages should be reasonably proportioned to the actual damages found." *Southwestern Investment Co. v. Neeley*, 452 S.W.2d 705 (Tex.1970); *see also Maxey v. Freightliner Co., supra*, at 1377. Texas courts look to five factors in evaluating whether a punitive damage award is proportionally excessive: (1) the nature of the wrong; (2) the character of the conduct involved; (3) the degree of culpability of the wrongdoer; (4)

the situation and sensibilities of the parties; and (5) the extent to which the defendant's conduct offends a public sense of justice and propriety. *First Security Bank & Trust Co. v. Roach*, 493 S.W.2d 612, 619 (Tex.Civ.App.—Dallas 1973, writ ref'd n.r.e.). In addition to these factors, when an appellate court has determined that a remittitur of a substantial portion of the actual damages found by a jury is required, it must then also give consideration to the ratio between actual and punitive damages as established by the jury. *Southwestern Investment Co. v. Neeley, supra*, at 708. *See also Natco, Inc. v. Williams Brothers Engineering Co.*, 489 F.2d 639 (5th Cir. 1974) (district court directed to order remittitur of actual damages and proportionate remittitur of punitive damages).

The jury awarded Hansen punitive damages that approximately equaled actual damages. Having determined that a remittitur of actual damages is required in this case, we find that a proportionate reduction of punitive damages is required. Accordingly, we determine that a remittitur of punitive damages to $300,000 is proper in this case.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed as to liability. However, we reverse as to damages, and remand to the district court. On remand, Hansen shall be given the option of accepting or rejecting the remittitur thus determined. If Hansen accepts the remittitur, the district court shall grant the remittitur and enter judgment accordingly. If Hansen refuses the remittitur, the district

11. *See, e.g., Barger v. Petroleum Helicopters, Inc.*, 514 F.Supp. 1199 (E.D.Tex.1981) (award of $22,090 for loss of services of 46-year-old man); *State v. Teer*, 542 S.W.2d 255 (Tex.Civ.App.—Waco 1976, writ ref'd n.r.e.) (award of $15,000 for loss of household services of 26-year-old woman); *C.E. Duke's Wrecker Service, Inc. v. Oakley*, 526 S.W.2d 228 (Tex.Civ.App.—Houston [1st Dist.] 1975, writ ref'd n.r.e.) (award of $6,000 for loss of wife's services).

12. *Compare with Amoco Production Co. Inc. v. Thompson* 657 S.W.2d 824 (Tex.App.—Corpus

Christi 1983) ($105,000 to welder for pain and suffering occurring from severe burns); *Hernandez v. Braddock*, 641 S.W.2d 359 (Tex.Civ. App.—Corpus Christi 1982) ($50,000 award to woman who suffered fractured clavicle, fractured pelvis, dislocation of joints in her pelvis, and multiple skin abrasions); *Ferrero v. United States*, 603 F.2d 510 (5th Cir.1979) (award of $375,000 to 53-year-old female who was severely and painfully injured in automobile accident for pain and suffering *and* loss of earning capacity).

court shall grant a new trial solely on the issue of damages.

The judgment of the district court is AFFIRMED in part, REVERSED in part and REMANDED with instructions. Costs to be born by appellant.