United States Court of Appeals,

Fifth Circuit.

No. 91–2604.

HCI CHEMICALS (USA), INC., Plaintiff–Appellee,

v.

HENKEL KGaA, Defendant–Third Party Plaintiff–Appellant,

v.

EMPRESA NAVIERA SANTA, S.A., Third Party Defendant–Appellee.

July 27, 1992.

Appeal from the United States District Court For the Southern District of Texas.

Before KING, JOHNSON, and DAVIS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Appellant, Henkel KGaA ("Henkel"), appeals the district court's award of $592,755.70 in damages plus attorney's fees to HCI Chemicals (U.S.A.), Inc. ("HCI") for breach of contract. The district court found that Henkel supplied HCI with nonconforming goods and that, following its first opportunity to inspect them, HCI properly rejected the goods. We conclude that HCI did not effectively reject the goods but is entitled to recover the same amount of damages under an acceptance theory of recovery for Henkel's breach of warranty. We therefore affirm the district court's judgment.

I.

In late 1988, HCI and Henkel, two chemical trading companies, entered into two contracts for the sale of 324 metric tons of sodium cyanide. Under these contracts, Henkel agreed to sell HCI the sodium cyanide for $579,148.92. Contemporaneous with these contracts, in a back-to-back transaction, HCI resold the sodium cyanide to USA Sentinel Chemicals, Inc. ("Sentinel"), another chemical trading company, at a profit of $42,751.08. In turn, Sentinel itself contracted to resell the sodium cyanide.

HCI's contracts with Henkel required Henkel to deliver the sodium cyanide in new iron drums to HCI "FOT Iquique, Chile."[1] The contracts also provided that HCI would have the right to inspect the products at the time and place of delivery before paying for or accepting them. In addition, the contracts adopted the Uniform Commercial Code ("U.C.C." or "the Code") as the governing law for the agreement.[2]

Henkel and HCI agreed that the sodium cyanide would be shipped to HCI in Port Elizabeth, New Jersey in three shipments. Henkel originally bought the sodium cyanide at issue in this appeal from a German chemical manufacturer, who shipped it in drums to Henkel in Iquique, Chile. Pursuant to the contracts, Henkel later loaded, or "stuffed," some of these drums of sodium cyanide into containers provided by HCI and placed the containers on trucks. The trucks transported the drums to Antofagasta, Chile where the containers were loaded aboard vessels provided by HCI's carrier and shipped to the United States.

The first shipment of six containers arrived in New Jersey in satisfactory condition, but the second shipment of five containers and the third shipment of seven containers did not. When the second shipment arrived, HCI delivered the containers to its purchaser Sentinel without inspecting them. A short time later, Sentinel informed HCI that its customer had rejected one of the containers because some of the drums were leaking. Sentinel then cancelled its contract with HCI because the goods were damaged and, therefore, did not conform to the contract.

HCI notified Henkel that Sentinel's customer had rejected the container because of the

---

[1] The parties agree that "FOT" means "free on truck" and is the equivalent of "F.O.B." or "free on board." A contract that is F.O.B. or F.O.T. the place of shipment requires the seller to deliver the goods to the buyer's carrier at the place of shipment. V.T.C.A., Bus. & C. § 2.319(a). With such a contract, the risk of loss remains on the seller until it duly delivers conforming goods to the buyer. Id. § 2.509(a)(1). If the seller delivers nonconforming goods, the seller retains the risk of loss until cure or acceptance. *Id.* § 2.510(a).

[2] Although the contracts did not specify what version of the U.C.C. was to govern any disputes, the parties have stipulated that the Texas U.C.C. is to apply.

damaged drums and that HCI was having an independent cargo surveyor inspect them. The surveyor later concluded that the drums had been damaged before or during stuffing of the drums into the containers. As a result, when the third shipment arrived, HCI had it inspected. The drums from these containers were similarly damaged. HCI then informed Henkel that the third shipment's drums were damaged and that HCI would hold Henkel "responsible for all costs and damages incurred." Despite the damage, HCI was later able to sell the sodium cyanide for $142,859.38.

Nevertheless, when Henkel would not reimburse HCI for the costs it had suffered due to the damaged goods, HCI filed suit against Henkel for breach of contract. In a bench trial, the district court found that the sodium cyanide was nonconforming, i.e., damaged, when Henkel delivered it in Chile. The court also determined that HCI's first opportunity to inspect the chemicals arose in New Jersey and that, following its inspection, HCI properly and timely rejected the chemicals. As a result, the court awarded HCI $592,755.70 in damages plus pre- and post-judgment interest and $150,000 in attorney's fees for timely rejecting the nonconforming goods.

In this appeal, Henkel argues that the district court erred in finding that the goods were nonconforming when delivered. More particularly, Henkel contends that the district court erred in: (1) finding that the chemicals were nonconforming, based on inadmissible settlement evidence; (2) holding that HCI effectively rejected the goods; and (3) calculating damages. We conclude that the court did not err in determining that the goods were nonconforming when delivered but did err in finding that HCI effectively rejected the chemicals. Nonetheless, we hold that HCI is entitled to damages in the amount the district court awarded.

II.

We begin our analysis by considering the court's determination that the goods were nonconforming when delivered in Chile and Henkel's argument that the court relied on inadmissible evidence in reaching this conclusion. The district judge found that although he did not know the

cause of the damage the goods were clearly nonconforming and the damage must have occurred before Henkel delivered the goods to the carrier. Relying on affidavits of two alleged eyewitnesses, Henkel argues that the district court erred in finding the goods nonconforming as of delivery.

In reviewing the district court's judgment, we will not set aside the court's findings of fact unless they are clearly erroneous. Fed.R.Civ.P. 52(a); *Chandler v. City of Dallas,* 958 F.2d 85, 89 (5th Cir.1992). Henkel, therefore, has the burden of demonstrating that the finding is unsupported by substantial evidence, that is, that the finding is against the clear weight of the evidence. Having reviewed the record, we find that substantial evidence supports the district court's conclusion.

At trial, the parties presented conflicting evidence of the origin of the damage to the drums. Henkel submitted the affidavits of a Chilean customs official and one of the truckers, both of whom stated that they witnessed the stuffing and did not observe any damage to the drums. In support of its case, HCI pointed to the conclusions of four independent surveyors, each of whom determined that the damage arose prior to or during stuffing. Based on the conclusions in the surveyors' reports, the district court was entitled to find that the goods were nonconforming when delivered.

The first inspection, conducted by Commodity Control Services Corporation ("Comtrol"), occurred shortly after the second shipment arrived in New Jersey. Comtrol concluded that the drums used were not newly constructed steel drums and that whatever caused the damage happened before the loading of the containers. Later, after the third shipment arrived in New Jersey, Toplis and Harding, Inc. surveyed the drums from both shipments. Toplis and Harding thought that the damage to the drums arose prior to or in the process of stuffing them into the containers. Finally, the parties agreed to a joint survey in early 1990 by Expertisebureau Schaft B.V. and Gay & Taylor, Inc. The joint survey indicated that the damage could not have arisen during transportation from Chile to the

United States but, instead, must have occurred before the containers were loaded in Chile.[3]

Henkel argues that the court based its finding of nonconformity on inadmissible evidence of settlement negotiations. Henkel contends that the court's conclusion rests on its belief that Henkel agreed to be bound by the joint survey. According to Henkel, the source for this conclusion is a document, the "Tischer telefax," that represents inadmissible settlement negotiation evidence under Rule 408 of the Federal Rules of Evidence.[4] This document states Henkel's willingness to use the joint survey in "further discussions" and to "remain open" to "any realistic proposal." Henkel also maintains that the joint survey itself contains inadmissible evidence of the parties' settlement discussions.

To preserve error for appellate review, a party must object to admission of the evidence and, unless apparent, state the specific ground for the objection at trial. Fed.R.Evid. 103(a)(1); *Calcasieu Marine Nat'l Bank v. Grant,* 943 F.2d 1453, 1458 (5th Cir.1991); *Petty v. Ideco, Div. of Dresser Indus., Inc.,* 761 F.2d 1146, 1150 (5th Cir.1985). If a party fails to object at trial, however, we may review the trial court's admission of the evidence for "plain error." Fed.R.Evid. 103(d). At trial, Henkel did not object specifically to either the Tischer telefax or the joint survey as inadmissible under

---

[3]All four surveyors found that all of the drums had suffered some damage. The joint survey concluded that only ten percent of the drums were commercially acceptable for distribution in the United States.

[4]Rule 408 of the Federal Rules of Evidence provides that

> Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

Fed.R.Evid. 408.

Rule 408. Consequently, we may only consider whether admission of the evidence constitutes plain error.

As we have recognized previously, the " "plain error rule' is an extraordinary remedy which is invoked only in exceptional circumstances to avoid a miscarriage of justice." *Petty,* 761 F.2d at 1150. "Plain error is error which, when examined in the context of the entire case, is so obvious and substantial that failure to notice and correct it would affect the fairness, integrity, or public reputation of the judicial proceedings." *Calcasieu Marine Nat'l Bank,* 943 F.2d at 1460. In light of the entire case, admission of the Tischer telefax and the joint survey does not represent plain error.

Contrary to Henkel's assertion, the Tischer t elefax played little, if any, role in the judge's decision. The fact that Henkel may have agreed to the joint survey is largely irrelevant to the court's reliance on the surveys, two of which HCI alone authorized.[5] Moreover, other evidence introduced at trial revealed that the parties had agreed to conduct the joint survey.

More importantly, in this appeal, Henkel only challenges the admissibility of the joint survey. Henkel does not challenge or refute either of the other two surveys, which independently support the court's finding on nonconformity. As we have recognized before, the "improper admission of evidence that is merely cumulative on matters shown by other admissible evidence is harmless error." *Hansen v. Johns–Manville Products Corp.,* 734 F.2d 1036, 1040 (5th Cir.1984), *cert. denied,* 470 U.S. 1051, 105 S.Ct. 1749, 84 L.Ed.2d 814 (1985). See also *Crues v. KFC Corp.,* 768 F.2d 230, 233 (8th Cir.1985); *McClure v. Mexia Indep. Sch. Dist.,* 750 F.2d 396, 402 (5th Cir.1985). Thus, admission of the Tischer telefax and the joint survey is not plain error.

---

[5]In announcing his findings and conclusions, the district judge stated:

> There are some modest opportunities for some damage during the transfer to the warehouse in New Jersey, but it is clear from four separate experts, one of whom was hired and Henkel agreed to be bound by, found that the damage was not caused in transit or by anybody in New Jersey, but it was as delivered to the carrier.

III.

As a result of the nonconformity, HCI had the right to reject the sodium cyanide, and the risk of loss remained with Henkel until accepted by HCI. See V.T.C.A., Bus. & C. §§ 2.510(a), 2.601; *T.J. Stevenson & Co. v. 81,193 Bags of Flour,* 629 F.2d 338, 356 (5th Cir.1980). The district court found that HCI properly and timely exercised this right to reject, following its first reasonable opportunity to inspect the goods, which occurred in New Jersey. Henkel argues that the parties' contracts required HCI to inspect the chemicals in Chile and that HCI forfeited its right to reject by failing to inspect there. Henkel also contends that, regardless of where HCI was obligated to inspect and accept the chemicals, HCI never properly rejected them. We consider these arguments *seriatim.*

The Texas U.C.C. conditions a buyer's duty to accept goods on the buyer's right to conduct a reasonable inspection of the goods before acceptance. See *T.J. Stevenson,* 629 F.2d at 358. The U.C.C. provides that

> [u]nless otherwise agreed ..., where goods are tendered or delivered or identified to the contract for sale, the buyer has a right before payment or acceptance to inspect them at any reasonable place and time and in any reasonable manner. When the seller is required or authorized to send the goods to the buyer, the inspection may be after arrival.

V.T.C.A., Bus. & C. § 2.513(a). Section 2.513(a) states the Code's general rule that a seller must afford a buyer a reasonable opportunity to inspect the goods before the buyer must pay for or accept them. See id. comments 2, 3. Moreover, § 2.513(a) expresses the Code's presumption that with respect to a shipment contract the place of arrival is a reasonable place for inspection.

Nevertheless, as Henkel argues, § 2.513(a) also permits the parties to designate, in their contract, a reasonable place or manner of inspection. When the parties establish a place of inspection by contract, the Code generally presumes this place to be exclusive, unless inspection there becomes impossible. Id. § 2.513(d) comment 6. Henkel maintains that the parties agreed that the exclusive place for inspection would be Chile and that HCI's inspection in New Jersey was, therefore, untimely and improper. We disagree.

The parties' contracts contain two provisions governing inspection, which provide:

> 8. Inspection:  HCI reserves the right to inspect for quality/quantity.

> 16. Right of Inspection/Survey and Costs:  Buyer shall have the right to inspect the products at the time and place of delivery before paying [sic] or accepting them.  Independent, outside inspector/surveyor costs to be split 50/50 by Buyer and Seller.

Henkel argues that paragraph 16 of the contracts expressly limited HCI's right of inspection to Iquique, Chile, the place of delivery.[6]  Paragraph 16 does not state or imply, however, that the place of delivery is to be the exclusive place of inspection.  Instead, this paragraph merely gives HCI the right to inspect in Chile.  The language of paragraph 16 does not evince an intent by the parties to supplant § 2.513(a)'s general provisions entirely.  Consequently, the district court did not err in finding that HCI was entitled to inspect the chemicals in New Jersey.  Under the Code, New Jersey, as the place of arrival, was a presumptively reasonable place for inspection.

Henkel also argues that HCI's agents, in fact, inspected and accepted the sodium cyanide in Chile.  Henkel states that one of the truckers, who transported the containers from Iquique to Antofagasta, and a Chilean customs official were HCI's agents and that they inspected and accepted the chemicals.  Henkel fails to demonstrate, however, that any agency relationship existed between HCI and the trucker or Chilean customs agent.  Even if such a relationship did exist, the record contains no evidence that either man had the authority or expertise to inspect and accept the sodium cyanide.  The district court was therefore entitled to reject the argument that HCI's agents inspected and accepted the chemicals in Chile.

## IV.

The district court found that HCI rejected the chemicals promptly as a matter of fact and law.  Nonetheless, the court made no specific findings on how and when HCI rejected the sodium cyanide.

---

[6]In a contract that is F.O.B. place of shipment—a shipment contract—the place of delivery is the place of shipment, i.e., the place where the seller delivers the goods to the carrier.

On appeal, Henkel contends that, even after the chemicals arrived in and were inspected in New Jersey, HCI never properly or timely notified Henkel that HCI was rejecting the chemicals. Henkel argues that, as a result, HCI is not entitled to recover damages under a rejection theory of recovery.

"A tender or delivery of goods made pursuant to a contract of sale, even though wholly non-conforming, requires affirmative action by the buyer to avoid acceptance." V.T.C.A., Bus. & C. § 2.602 comment 1. A buyer effectively rejects nonconforming goods when the buyer "within a reasonable time after their delivery or tender ... seasonably notifies the seller" that it will not accept the goods. Id. § 2.602(a). See generally James J. White and Robert S. Summers, Uniform Commercial Code § 8–3 (3d ed. 1988) ("White and Summers"). As Professors White and Summers emphasize, § 2.602(a) imposes two procedural requirements on a buyer who seeks to reject nonconforming goods. See id. at p. 361. The Code requires that the buyer notify the seller of its rejection and that this notice be timely. In addition, "[t]he notice envisioned by Tex. Bus. & Comm. Code § 2.602 must be clear and unambiguous." *Explorers Motor Home Corp. v. Aldridge,* 541 S.W.2d 851, 854 (Tex.Civ.App.—Beaumont 1976, writ ref'd n.r.e.).

Applying these principles to the facts of this case, we conclude that HCI failed to give Henkel sufficient notice of rejection.[7] Shortly after the second shipment arrived in New Jersey, HCI informed Henkel that its customer had rejected one of the containers because of damage to the drums. HCI also notified Henkel that it was instructing an independent surveyor to inspect the drums and later conveyed the surveyor's results to Henkel. Further, when the final container of this shipment arrived, HCI informed Henkel that these drums too were damaged and that, as a result, its customer had cancelled its contract. More significantly, HCI told Henkel that because of the damage it would "hold Henkel responsible for any and all costs that may arise due to or as a consequence of the NACN [sodium cyanide] arriving in a state not in keeping with the contractual obligations undertaken by

---

[7]As a result of this holding, we need not address Henkel's argument that HCI did not timely reject the goods.

Henkel ... [including the costs of] warehousing of the damaged drums, redrumming and new drums, consequential loss due to a drop in market price of NACN, etc." When the third shipment arrived, HCI similarly notified Henkel that it would "hold [Henkel] responsible for all costs and damages incurred" due to the damaged drums.

These communications clearly informed Henkel that the goods were nonconforming and that HCI considered Henkel responsible for the damage. Despite these communications, however, HCI never clearly and unambiguously notified Henkel that HCI would not accept the chemicals. See *CMI Corp. v. Leemar Steel Co.,* 733 F.2d 1410, 1414 (10th Cir.1984) (holding notice that the buyer had a "problem" with the goods was insufficient to constitute a rejection); *T.J. Stevenson,* 629 F.2d at 358 (holding notice of the buyer's dissatisfaction with the goods and feeling that the seller was responsible was not an effective rejection). In fact, HCI's statement that it intended to hold Henkel responsible for HCI's costs and damages suggests that HCI would accept the goods but hold Henkel liable for any losses resulting from the goods' nonconformity. HCI cannot recover damages under a rejection theory of recovery, therefore, because HCI did not effectively reject the chemicals.

HCI's failure to reject the chemicals, however, does not preclude HCI from recovering any damages for the nonconformity of the goods. The Code presumes that a buyer who has failed to make an effective rejection has accepted the goods. V.T.C.A., Bus. & C. § 2.606(a)(2). A buyer who accepts nonconforming goods does not automatically forfeit its right to recover damages for the seller's breach of warranty. Id. § 2.607(b) ("acceptance does not of itself impair any other remedy [than rejection or revocation for a nonconformity of which the buyer had knowledge before acceptance] provided by this chapter for non-conformity."); *T.J. Stevenson,* 629 F.2d at 358. Instead, under the Texas U.C.C., a buyer who accepts nonconforming goods may recover, as a result of the seller's breach of warranty, "the difference at the time and place of acceptance between the value of the goods as accepted and the value they would have had if they had been as warranted." V.T.C.A., Bus. & C. § 2.714(b). See also *Sweco, Inc. v. Continental Sulfur and Chem.,* 808 S.W.2d

112, 117–18 (Tex.App.—El Paso 1991, writ denied). In addition, the buyer may recover incidental and consequential damages. V.T.C.A., Bus. & C. §§ 2.714(c), 2.715. Consequently, we must consider what, if any, damages HCI may recover under an acceptance theory of recovery, that is, under § 2.714.

HCI contends that, under an acceptance theory of recovery, it should recover the difference between the contract and resale prices together with any consequential and incidental damages. We agree. Under § 2.714(b), in determining the value of the goods as warranted, the fair market value of conforming goods at the time of acceptance is the most appropriate measure of the warranted value. White and Summers § 10–2, at 435. "When fair market value cannot be easily determined, or the parties do not raise it as a measure of value, the purchase price may turn out to be strong evidence of the value of the goods as warranted." Id. Texas courts have recognized that "[p]roof of the contract purchase price, standing alone, is sufficient to support a finding that that amount was the fair market value as warranted by the seller." *Sweco,* 808 S.W.2d at 118. See also *Lone Star Ford, Inc. v. McGlashan,* 681 S.W.2d 720, 725 (Tex.App.—Houston [1st Dist.] 1984, no writ).

Except for the contract price, Henkel has failed to present any evidence of the fair market value of the goods as warranted, or some other more appropriate value, as of the date of acceptance. The contract price corresponds to Henkel and HCI's valuation of the goods at least at the time they entered into the contract. In the absence of competent evidence demonstrating a different value at the time of acceptance, the district court would have had no alternative but to adopt the contract price as the value of the goods as warranted.

Similar reasoning guides our analysis of the value of the goods as accepted, the second part of the § 2.714(b) formula. In light of the evidence in the record, the court was obliged to find that the resale price represented the value of the sodium cyanide as accepted. See *Transoil (Jersey) Ltd. v. Belcher Oil Co.,* 950 F.2d 1115, 1121 (5th Cir.1992); *Lackawanna Leather Co. v. Martin &*

*Stewart, Ltd.,* 730 F.2d 1197 (8th Cir.1984); *GNP Commodities, Inc. v. Walsh Heffernan Co.,* 95 Ill.App.3d 966, 51 Ill.Dec. 245, 420 N.E.2d 659 (1981); White and Summers § 10–2, at 436. We also note that, under § 2.714(a), a court may determine a buyer's damages for the acceptance of nonconforming goods "in any manner [that] is reasonable." V.T.C.A., Bus. & C. § 2.714(a). Therefore, HCI is entitled to recover $436,290.54, the difference between the contract and resale prices.

In addition, HCI may recover $77,494.30 in consequential damages for the cancellation of its contract with Sentinel due to the nonconformity of the goods. As consequential damages, HCI is entitled to its lost profits and the cost of shipping the chemicals to the United States, which Sentinel was obligated to reimburse to HCI under their contract. Finally, HCI may recover $78,970.86 in incidental damages for warehouse storage costs and fees, inspection fees, and expenses related to the resale of the chemicals, incurred as a result of Henkel's breach. Thus, despite the fact that we analyze this case under an acceptance theory of recovery, we find that HCI should recover $592,755.70 in damages—the same amount that the district court awarded.[8]

V.

Henkel also challenges the district court's award of $150,000 in attorney's fees to HCI. Henkel argues that we should reverse the district court's award because the district judge issued inconsistent findings. According to Henkel, despite his conclusion that $150,000 represented reasonable attorney's fees, the judge stated that the amount "seems high to me." We review the district court's award of fees for abuse of discretion. *Lubrizol Corp. v. Exxon Corp.,* 957 F.2d 1302, 1308 & n. 14 (5th Cir.1992); *Von Clark v. Butler,* 916 F.2d 255, 259 (5th Cir.1990).

---

[8]We note that, several times in its brief, Henkel argues that the court awarded damages that are only recoverable under an acceptance theory. Assuming the goods are nonconforming, Henkel does not contend that the court's award would, in any way, be improper under such a theory.

In context, the judge's statement is not inconsistent with the his findings.  In awarding fees, the judge commented:

> I find the reasonable attorney's fees and direct attorney's fee related expenses to be $150,000. That seems high to me, but they all do;  but based on the evidence and the energy that went into the case, that seems to be a reasonable fee for the necessary services in the prosecution of this claim.

The record sufficiently supports the district court's findings in awarding $150,000 in attorney's fees.

We conclude that the district court did not abuse its discretion in its award of fees.

VI.

For these reasons, we affirm the judgment of the district court.[9]

AFFIRMED.

---

[9]In its Amended Final Judgment, the district court entered a take nothing judgment in favor of Empresa Naviera Santa, S.A. Henkel has not challenged this ruling in its appeal, and we therefore affirm the court's judgment with respect to Empresa Naviera Santa, S.A.