In re BILL'S DOLLAR STORES, INC., Debtor.

HAYWIN TEXTILE PRODUCTS, INC., Plaintiff,

v.

BILL'S DOLLAR STORES, INC., Defendant.

Bankruptcy No. 93–808.
Adv. No. A–93–102.

United States Bankruptcy Court, D. Delaware.

March 10, 1994.

R. Stokes Nolte, Bailey & Wetzel, P.A., Wilmington, DE, Richard S. Last, Dunn & Zuckerman, P.C., New York City, for Haywin Textile Products, Inc.

James L. Patton, Jr., Laura Davis Jones, Joel A. Waite, Bhavana Sontakay, Young, Conaway, Stargatt & Taylor, Wilmington, DE, Robert E. Gerber, Edward M. Ross, Fried, Frank, Harris, Shriver & Jacobson, New York City, for Bill's Dollar Stores, Inc.

## MEMORANDUM OPINION

PETER J. WALSH, Bankruptcy Judge.

### INTRODUCTION

Before the court are cross-motions for summary judgment in an adversary proceeding filed by Plaintiff Haywin Textile Products, Inc. ("Haywin") against Defendant/Debtor-in-Possession Bill's Dollar Stores, Inc. ("BDS") seeking reclamation of goods, pursuant to Section 546(c)[1] of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*[2] and Fed.R.Bankr.P. 7001 and 7003. As the goods in question have been sold by BDS in the ordinary course of its business, Haywin now seeks § 503(b) priority for its claims pursuant to § 546(c)(2)(A).

This court has jurisdiction pursuant to 28 U.S.C. § 1334 and § 157(a). This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

Both parties assert, and the court agrees, that there are no genuine issues of material fact. The legal issue to be decided—whether goods which arrive at a buyer's yard but remain in common carriers' trailers, unhitched from their cabs and left in the yard by the carriers, are "received" for the purpose of § 546(c) on the day they arrive in the yard or two days later when they are unloaded into the buyer's warehouse—is appropriate for disposition by summary judgment. Because I conclude that BDS "received" the goods when they were deposited in its yard, Haywin does not have valid reclamation claims with respect to those goods as its demand was not "made within ten days after receipt of such goods by the debtor" as required by § 546(c)(1), and summary judgment will be granted in favor of BDS.

### FACTS AND POSITIONS OF THE PARTIES

Haywin is an importer and wholesale distributor of home textile products, including bedsheets, towels, etc. BDS operates a large chain of retail stores. BDS and Haywin had from time to time contracted for the purchase/sale of textile products in the ordinary course of both company's businesses. The goods at issue are the subject of two purchase orders aggregating $169,579 and were shipped under three separate bills of lading. The goods were picked up by two different common carriers at Haywin's facility in Brooklyn, New York on June 23 and 25, 1993, and both carriers arrived at BDS's central warehouse yard in Columbus, Missis-

---

1. Section 546(c) provides:

    Except as provided in subsection (d) of this section, the rights and powers of a trustee under sections 544(a), 545, 547, and 549 of this title are subject to any statutory or common-law right of a seller of goods that has sold goods to the debtor, in the ordinary course of such seller's business, to reclaim such goods if the debtor has received such goods while insolvent, but—
    (1) such a seller may not reclaim any such goods unless such seller demands in writing reclamation of such goods before ten days after receipt of such goods by the debtor; and
    (2) the court may deny reclamation to a seller with such a right of reclamation that has made such a demand only if the court—
    (A) grants the claim of such a seller priority as a claim of a kind specified in section 503(b) of this title; or
    (B) secures such claim by a lien.
    11 U.S.C. § 546(c).

2. All references to the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*, will be "§ ___".

sippi on Sunday, June 27, 1993.[3] The carriers' drivers disengaged the trailers from their cabs, received copies of the bills of lading signed by BDS's employees, and left BDS's premises. The goods remained in the trailers until June 30, 1993 when BDS's personnel transferred them to BDS's warehouse.

■ Upon discovery of what it alleges was BDS's insolvency[4] and pursuant to § 546(c) and U.C.C. § 2–702(2)[5], Haywin sent a written demand for reclamation by letter on Friday, July 9, 1993 and by telefax on Monday, July 12, 1993. BDS received the demand by telefax on July 12, the day it filed its voluntary Chapter 11 petition without having paid Haywin for the goods. The date of the dispatch, rather than the date of receipt, determines when a "demand" is made for purposes of § 546(c). *Montello Oil Corp. v. Marin Motor Oil, Inc. (In re Marin Motor Oil, Inc.)*, 740 F.2d 220 (3d Cir.1984). While BDS has reserved the right to contest whether Haywin actually sent the July 9 demand letter, for purposes of the cross-motions for summary judgment, BDS agrees that the demand of July 9 satisfies the 10 day requirement *if* the § 546(c)(1) receipt is deemed to have occurred on June 30 as a matter of law.

In support of its position that receipt occurred on June 30, Haywin makes two principal arguments: BDS did not have unlimited physical possession of the goods until June 30, and BDS's payment practices treat the date the goods arrive in the warehouse as the date of "receipt."

Relying on U.C.C. § 2–103(1)(c) which defines "receipt of goods" as "taking physical possession of them", Haywin claims that it was not until BDS unloaded the goods from the common carrier's trailers on June 30 that it took physical possession and therefore receipt occurred. Since, according to Haywin, the trailers were owned by the common carriers, BDS did not have unfettered possession until June 30. Furthermore, according to Haywin, Haywin "could have exercised [its] remedy of stopping delivery upon discovery of [BDS's] insolvency, outside of [its] reclamation rights, and the carrier could have re-connected the trailers to the trucks and removed [Haywin's] goods from the yard."

As to BDS's payment practices, Haywin points out that receipt of the goods in BDS's warehouse, not the yard, is a triggering event. When the goods are received in the warehouse they are inspected for quality and quantity, the correct amount owed to the seller is determined, BDS's payment obligation is recorded in its computer based accounting system, and the payment obligation commences. BDS's "checker sheets" and warehouse receiving forms indicate that these "receipt" events occurred on June 30, at the earliest. Furthermore, BDS's purchase orders show "2% ROG," which Haywin says means that BDS is entitled to a 2% discount if the invoice is paid upon receipt of

---

3. A third purchase order in the amount of $12,833 is also the subject of Haywin's reclamation action. However, BDS has acknowledged that as to the $12,833 Haywin has a valid reclamation claim and that claim will be accorded priority pursuant to § 546(c)(2)(A). The only issue relating to that $12,833 claim is whether Haywin is entitled to immediate payment. The timing of payment is a matter of discretion by the court. Three of the other eight reclamation actions in this case have been settled by stipulation. Only one stipulation provides for immediate payment of any part of the claim—and that is in exchange for favorable post-petition trade terms being provided to BDS by the claimant. In light of the fact that most claimants are not receiving immediate payment of their allowed claims, and because other factors which may be appropriate for me to consider in deciding when payment should be made are not before me in the context of these cross-motions for summary judgment, I decline to rule on Haywin's request for immediate payment of the $12,833. Haywin is free to pursue immediate payment by appropriate motion.

4. BDS does not concede that it was insolvent at any time in late June 1993 or early July 1993. However, whether BDS was insolvent at any time is irrelevant for the purposes of the reclamation claims, because BDS has agreed to afford superpriority status to creditors who otherwise satisfy the requirements for reclamation status— i.e., without regard to solvency or insolvency.

5. Section 2–702(2) of the Uniform Commercial Code provides, in pertinent part:

Where the seller discovers that the buyer has received goods on credit while insolvent he may reclaim the goods upon demand made within ten days after the receipt ...
U.C.C. § 2–702(2).

goods and BDS has acknowledged that receipt in the warehouse controls where payment terms are based on "receipt of goods."

In response to Haywin's argument that BDS did not have unfettered physical possession, BDS argues that when the common carriers disengaged the trailers containing the goods, they thereby delivered sole custody of the goods to BDS, and when they left BDS's premises they could no longer exercise any further dominion or control over the goods. In support of this position, the affidavit of a BDS officer describes the procedures with respect to a weekend delivery, such as the one which occurred here. The common carrier's driver is checked into the yard by BDS's security guard. The security guard records the carrier, truck and trailer number, seal number and time of delivery on a log sheet. The driver then transports the shipment to a designated location in the yard and disconnects the trailer. In accordance with these procedures, all three of the relevant bills of lading were signed by a BDS security guard and copies were given to the drivers.[6] BDS's written understanding with common carriers is that "carriers are expected to drop their trailers on Bill's Dollar Stores yard and will be unloaded or loaded by [BDS] personnel at [BDS] convenience." Thus, the physical unloading of trailers is performed by BDS's employees who open the unlocked trailers thereby breaking a plastic seal.[7]

Both common carriers confirmed the drop off on Sunday, June 27, the receipt of the bills of lading signed by a BDS security guard, and the departure of their drivers. According to their affidavits,

[f]rom our perspective ... as common carrier[s], once the goods were delivered to Bill's on June 27, and Bill's signed the bills of lading on the same date, delivery was complete. From that point on, we did not retain any liability or rights in connection with the merchandise contained in our trailers.

In response to Haywin's claim that the common carriers retained possessory rights until the trailers were unloaded, BDS states that its policy is that if a common carrier were to come back to the yard to exercise possessory rights over the goods, BDS would not grant the driver permission or access to the warehouse yard. Consistent with that policy, the affidavits of the two common carriers state that after the June 27 drop off they did not assert, or attempt to assert, any control over the goods and their understanding of the parties' rights was that they could not have re-entered BDS's yard to "stop" delivery or "reclaim" the goods.

As to Haywin's argument about BDS's payment practices, BDS responds that the time of inspection of the goods, the time of accounting entries for invoices and the time for payment obligation are not relevant to the issue of physical possession under U.C.C. § 2–103(1)(c) or "receipt" contemplated by § 546(c)(1).

## DISCUSSION

■ Section 546(c) adopts the U.C.C. § 2–702 right of a seller to reclaim goods it sold to an insolvent buyer by permitting the seller to make a written demand for reclamation before ten days after "receipt of such goods by the debtor". Thus, § 546(c) adopts the seller's UCC reclamation right but adds to it the requirement that the seller make such demand *"in writing"* and *"before ten days after receipt"* of the goods by the debtor. (emphasis provided). While the Bankruptcy Code does not define "receipt," the U.C.C., from which the right of reclamation derives, defines receipt of goods as "taking physical possession of them," UCC § 2–103(1)(c), and courts have adopted that definition for purposes of § 546(c). *See, e.g., Marin* at 224–25.

---

6. BDS's procedure for weekday deliveries differs slightly. In those situations a receiving clerk is available to give the driver a copy of the bill of lading stamped "received" with the date. Thus, when delivery is made on the weekend, the receiving clerk's stamp on the bill of lading is dated the following Monday. In the situation here, there are bills of lading showing the security guard's signature of June 27 and other copies of the bills of lading showing the receiving clerk's stamp of June 28.

7. Each of the three bills of lading show a number for the plastic seal.

Both parties cite *Marin* as supporting their respective positions as to when BDS is deemed to have taken physical possession of—and therefore "received" for the purposes of § 546(c)(1)—the goods. In *Marin*, a commercial barge operated by a common carrier picked up gasoline from the seller's terminal and transported it to a terminal where the buyer had storage rights. The barge arrived at the latter terminal on April 10, but the gasoline was not unloaded into the storage facility until the following day, April 11. On April 21, the same day the buyer filed for reorganization under Chapter 11, the seller transmitted by telex a demand for reclamation of the gasoline.

The court in *Marin* concluded that the date of "receipt" of the gasoline by the buyer was April 11, when the buyer's bailee took actual physical possession of the gasoline by the carrier's having pumped it into the bailee's storage facilities. Haywin focuses on this conclusion of the *Marin* court that receipt occurred when the buyer had physical possession and argues that likewise BDS did not have actual physical possession of the goods until June 30 when it unloaded them into its warehouse. It analogizes the carriers' pumping the gas onto the bailee's facilities in *Marin* to BDS's transferring the goods to its warehouse in the present situation, arguing that the only difference between the two situations is that the common carrier in *Marin* presumably could not separate its power mechanism from its container (i.e., the tanks were apparently a physical part of the motorized barge) as could the motor carriers in the instant case (i.e., by separating the cabs from the trailers).

In applying *Marin* to the instant situation, I believe the focus should be on *Marin's* analysis of the complimentary rights of a seller to either (a) stop delivery by the carrier, or (b) reclaim from the buyer. The *Marin* court observed that U.C.C. § 2–705[8] "views goods given by a seller to a common carrier for delivery to a buyer as being in the possession of the common carrier not the

buyer, and gives the seller the right to stop delivery of the goods upon discovery of the buyer's insolvency." *Id.* at 225. The right of reclamation takes effect when the buyer "receives" the goods and the *Marin* court found the right to stop delivery and the right to reclaim to be complementary. "These rights, therefore, appear to be complementary: the right to stop goods applies while they are in the possession of the carrier, the right of reclamation applies once the goods have been received." *Id.* at 225, n. 11. The court reasoned that while the gasoline was in the physical possession of the common carrier, the seller's only remedy upon discovery of the buyer's insolvency was to order the carrier to stop delivery, but that once it was in the possession of the bailee—having been pumped into its storage facilities—the seller's right to stop delivery terminated and its right to reclaim the goods arose.

■ I am persuaded that it is this reasoning of the *Marin* court which is controlling here—that is, that "receipt" or "physical possession" occurs when a seller can no longer stop delivery of the goods and is left with only the remedy of reclamation. The proper analogy is therefore that of the barge carrier's pumping the gas into the bailee's facilities to the motor carriers' unhitching their trailers and driving away from BDS's yard. At each point the respective carriers relinquished possession of the goods, ending the sellers' rights to stop delivery. Responding to BDS's argument that the only difference between the situation in *Marin* and the situation at hand is the type of carrier, I note that the very fact that the carriers could remove the trailers from their cabs and drive away from BDS's yard enabled them to relinquish possession of the goods when they did.

The affidavits filed by the common carriers show that their drivers received copies of properly negotiated bills of lading—signed by a BDS security guard—evidencing delivery on Sunday, June 27; that the carriers considered delivery complete at such point;

---

8. U.C.C. § 2–705 provides, in pertinent part:
   (1) The seller may stop delivery of goods in the possession of a carrier or other bailee when he discovers the buyer to be insolvent (Section 2–702)....

   (2) As against such buyer the seller may stop delivery until
   (a) receipt of the goods by the buyer....
U.C.C. § 2–705(1), (2)(a).

and that the carriers believed that they no longer retained any liability or rights in connection with the goods. Furthermore, the carriers did not assert any control over the goods, and the affidavits reveal they believed that they had no right to "stop" delivery or "reclaim" the goods at the request of a seller. The carriers' belief in this regard is both reasonable and compelling. How could a carrier, having dropped off goods and departed the premises with a bill of lading bearing an acknowledgment by the buyer of "delivery", have the right to recall delivery at the request of a seller? To suggest such a right would produce chaos in this important area of commerce.

The carriers' views of "delivery" are in accord with BDS's view of "receipt." BDS's practice was that once the carrier disengaged the trailer and left BDS's premises with a signed bill of lading, BDS was free to unload the goods at its convenience. As noted above, BDS's expressed understanding with the carriers was that "[c]arriers are expected to drop their trailers on Bill's Dollar Stores yard and will be unloaded or loaded *by [BDS] personnel at [BDS] convenience*" (emphasis provided). That arrangement clearly reflects BDS's ability and intent to exercise unfettered control over the goods, and that arrangement is entirely consistent with "taking physical possession" as contemplated by U.C.C. § 2–103(1)(c). Although it is not clear from the *Marin* opinion, it appears that the barge carrier performed the task of unloading the gasoline into the storage tanks. Here, by agreement between the carriers and BDS, the carriers could not perform that task. BDS reserved to itself

that right and in exercising the right it was confirming the fact of its physical possession.

The descriptions by BDS and the carriers' of their respective rights are consistent with the language of the U.C.C. which uses "delivery" and "receipt" synonymously. Section 2–705 provides that a seller "may *stop delivery* [of goods in the possession of a carrier] *until . . . receipt* of the goods by the buyer . . ." (emphasis provided). Section 2–702 provides that a seller "may reclaim the goods upon demand made within ten days after the *receipt*, but if misrepresentation of solvency has been made. . . . within three months of *delivery* the ten-day limitation does not apply" (emphasis provided). Absent the involvement of parties other than a seller, a carrier and a buyer, a completed delivery by the carrier to the buyer should be deemed a § 546(c)(1) receipt by the buyer.

■ Haywin's unsupported assertions that it "could have exercised [its] remedy of stopping delivery upon discovery of [BDS's] insolvency"; that the "carrier could have reconnected the trailers to the trucks and removed [the] goods from [BDS's] yard"; that while the goods remained inside the carriers' trailers the carriers "retain[ed] control as well as responsibility for loss or damage to the goods", and that the carriers had the right "to exercise a lien over the goods [for unpaid freight, unpaid demurrage and detention] [and/or] recall the trailers" are simply contrary to the facts posited by BDS and the carriers and contrary to the relevant statutory provisions.[9]

I am not persuaded by Haywin's argument that a common carrier has a lien on the goods for unpaid demurrage charges, as well

---

9. The above assertions by Haywin were made in pleadings filed before the court heard oral argument on the motions. Following oral argument, I asked BDS to submit supplemental affidavits in response to specific questions regarding BDS's receiving practices and the carriers' delivery practices. I invited Haywin to submit its response to BDS's supplemental affidavits. BDS's supplemental affidavits, particularly those by the common carriers, provided specific facts contrary to the above cited conclusory statements by Haywin and those specific facts the court found important to this decision. Haywin's affidavit in response is not a form of affidavit satisfying the requirements of Fed.R.Civ.P. 56(e). Affidavits such as this which contain opinions, speculations, conclusions of law and argument are not sufficient to rebut the facts set forth in BDS's supplemental affidavits, which are in substantial compliance with Fed.R.Civ.P. 56(c). *See* 6 *Moore's Federal Practice*, ¶ 56.22[1] and [2] (2d Ed.). Haywin's motion papers advised that it completed pre-trial discovery. If Haywin needed an opportunity to develop specific facts to rebut BDS's supplemental affidavits, it could have pursued that opportunity under Fed.R.Civ.P. 56(f). Having elected not to do so, its non-complying affidavit does not rebut the facts fairly set forth in BDS's supplemental affidavits. *See Dowling v. City of Philadelphia*, 855 F.2d 136 (3d Cir.1988).

as unpaid freight and other charges, and that BDS therefore did not have absolute and singular control over goods which remained on the carriers' trailers. Haywin provides no authority to support its assertion, which is contrary to the express language of the U.C.C. providing that "[a] carrier loses his lien on any goods which he voluntarily delivers or which he unjustifiably refuses to deliver." U.C.C. § 7–307(3). While not referring to such a lien in their affidavits, the carriers explicitly state that they believed they retained "[no] rights in connection with the merchandise" after receiving signed bills of lading on June 27.

BDS had actual physical possession on June 27 because the carrier no longer had possession or any right of repossession. Given the inescapable fact that delivery occurred on June 27, to accept Haywin's argument that receipt did not occur until June 30 would produce an anomalous result under the analysis set forth in *Marin*. The right to stop delivery and the right to reclamation are complementary. When one terminates the other commences. To say that delivery occurred on June 27 but that receipt occurred on June 30 creates a two-day gap which is inconsistent with the provisions of U.C.C. §§ 2–702 and 2–705 (see p. 12 above).

■ The fact that BDS's inspection, payment obligation and accounting system revolve around the date that goods are received in its warehouse is not necessarily indicative of the delivery date. What BDS chooses to do with goods it has received and its payment obligation are irrelevant to the issue of when it has physical possession. For the same reasons that courts hold that the passing of title does not determine receipt under U.C.C. § 2–103(1)(c), *see, e.g., Marin* at 225, I conclude that inspection and accounting procedures do not determine physical possession. The happening of those events do not necessarily mean that the buyer is at that time "taking physical possession." The taking of unfettered physical pos-

session could occur before or after those events.[10]

### *CONCLUSION*

BDS received the goods on July 27 when the common carriers completely relinquished possession of them, i.e., made delivery. Haywin's reclamation demand on July 9 was therefore not within ten days as required by § 546(c)(1). Consequently, Haywin's motion for summary judgment is denied and BDS's cross-motion for summary judgment is granted. The court will enter an appropriate judgment order.

---

10. Using the date of the quantity and quality inspection in the warehouse as the receipt date for triggering the payment obligation is understandable. If receipt in the yard triggered that obligation, BDS could be processing and/or paying an invoice only to learn later that a quantity or quality deficiency requires an adjustment to the amount due on the invoice. This would obviously create bookkeeping difficulties.