**In re ZETA CONSUMER PRODUCTS CORP., Debtor,**

**Zeta Consumer Products Corp., Debtor–in–Possession, Plaintiff,**

**v.**

**Equistar Chemical, LP, Defendants.**

**Bankruptcy No. 00–34148 (NLW). Adversary No. 00–3627.**

United States Bankruptcy Court, D. New Jersey.

April 10, 2003.

Walter J. Greenhalgh, Toni Marie McPhillips, David J. DiSabato, Duane Morris, LLP, Newark, NJ, for Plaintiff.

Ronald L. Glick, Stevens & Lee, Cherry Hill, NJ, Mark S. Finkelstein, Shannon, Martin, Finkelstein & Sayre, Houston, TX, for Defendant.

## OPINION

NOVALYN L. WINFIELD,
Bankruptcy Judge.

This matter came on for hearing on the motion for summary judgment filed by

Zeta Consumer Products Corp. ("Zeta"), as debtor-in-possession, to avoid certain alleged preferential transfers made to Equistar Chemicals, L.P. ("Equistar"), pursuant to 11 U.S.C. § 547(b). In its complaint, Zeta alleges that two separate and distinct categories of transfers can be avoided. The first category deals with certain bulk resin shipments that were sold by Equistar to Zeta and then returned by Zeta approximately two weeks before Zeta's bankruptcy filing (the "Resin Transfers"). The second category involves certain payments made by Zeta to Equistar during the preference period (the "Monetary Transfers").

Equistar opposes Zeta's motion for summary judgment contending, among other things, that Zeta has failed to show it was insolvent at the time the transfers were made. Alternatively, Equistar argues that if insolvency is proved, then the return of resin by Zeta cannot be avoided because (i) those transfers were not property of Zeta at the time of the alleged transfer because Zeta had not taken actual possession of some of the resin; (ii) the resin was effectively reclaimed by Equistar prepetition, pursuant to state law; (iii) Equistar exercised its common law right to rescind and reclaim the resin; or alternatively that (iv) Zeta rejected or revoked its acceptance of the resin shipments. With regard to the Monetary Transfers, Equistar disputes the amount of subsequent new value credited by Zeta pursuant to 11 U.S.C. § 547(c)(4). Equistar also claims that three of the Monetary Transfers, made 81, 83, and 90 days after the invoice date, were made in the ordinary course of business pursuant to 11 U.S.C. § 547(c)(2). Because the Court finds that there are disputed material issues of fact, the Court denies Zeta's motion for summary judgment. Further, in order to narrow the issues for trial, the Court addresses herein the various defenses raised by Equistar.

This Court has jurisdiction to hear and determine this matter pursuant to 28 U.S.C. § 1334 and § 157(a) and the Standing Order of Reference issued by the United States District Court for the District of New Jersey on July 23, 1984. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(F). The following shall constitute findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

## STATEMENT OF FACTS

Zeta operated several facilities throughout the country that manufactured durable plastic houseware goods. As part of its manufacturing process, Zeta purchased various grades and types of plastic resin which were used to produce its finished products. (Cert. of Michael Grancio in Supp. of Pl. Summ. J. Mot. at ¶ 4 [hereinafter Grancio Cert.]). Equistar is one of several resin suppliers from whom Zeta regularly purchased resin.

### RESIN TRANSFERS

In the beginning months of 2000, Zeta experienced limitations on the availability of funds from its lender, and also was limited in its ability to obtain resin product. (Grancio Cert. At ¶ 6). Zeta claims that because of this situation any return of resin would be unusual and outside the ordinary course of Zeta's business. (*Id.*). In early April, 2000 resin vendors appeared at the Zeta facilities in Arlington, Texas ("Arlington Facility") and Leominster, Massachusetts ("Leominster Facility") to obtain the return of unused resin. (Grancio Cert. at ¶ 7; Jackowski Cert. at ¶ 7) With regard to the Arlington Facility, railcars of resin were returned from the Union Pacific railyard in Grand Prairie, Texas, where they were stored for Zeta. (Jackowski Cert. at ¶ 11). Zeta regularly stored railcars of resin at the Union Pacific

railyard because the rail siding at the Arlington Facility could only accommodate five railcars. In early April 2000 more than 3,700,000 pounds of resin were returned from the Arlington Facility (Jackowski Cert. at ¶ 14). Similarly, in early April 2000 more than 3,500,000 pounds of resin were returned from the Leominster Facility. (Grancio Cert. at ¶ 10). In total, Zeta returned over 8,400,000 pounds of resin to its suppliers in the early part of April 2000. (*Id.*). Equistar was one of the several resin vendors who received returned resin.

The resin shipments at issue in this adversary proceeding were comprised of four railcars of resin shipped to the Arlington Facility and two railcars of resin shipped to the Leominster Facility. Zeta's description of the pertinent facts regarding the delivery of the resin and its return from the Arlington Facility and the Leominster Facility are set forth in the charts annexed to this opinion.

With regard to the dates of transfer and the amount of resin transferred, Equistar does not markedly disagree with Zeta. Nonetheless, there are a couple of disputed facts. As reflected in the attached charts, Zeta contends that 932,700 pounds of resin were returned. However, Equistar supplies documentation which shows that with regard to the resin shipped to the Arlington Facility, 47,860 pounds of the third shipment was returned and 127,300 pounds of the fourth shipment was returned. (Def. Opp., Ex. E, E–3, and E–4). Thus, Equistar contends that the returned resin did not exceed 891,960 pounds. (Pease Cert. at ¶ 31). Additionally, Jackowski stated at deposition that he approximated the pounds of resin pumped from the silos in the Arlington Facility. (Def. Opp., Ex. I at pp. 50–51). Thus, there appears to be a factual dispute as to the amount of resin returned to Equistar.

Additionally, Equistar has provided documentation which it claims shows that the fourth shipment to the Arlington Facility was returned on April 5, 2000, and not April 11, 2000 as claimed by Jackowski. (Def.Opp., Ex. E–4).

Another disputed matter between Zeta and Equistar involves the issue of whether the railcars of resin at the Union Pacific Grand Prairie Yard can be considered as having been received by Zeta. James Jackowski ("Jackowski") the former Plant Manager of the Arlington Facility stated in his certification that because the rail siding at the facility could only accommodate five (5) railcars, Zeta regularly stored railcars at the Grand Prairie Yard (Jackowski Cert. at ¶ 11). He stated that he received a daily report informing him of the railcars received, and that he prepared a weekly report for Alfred Teo's office which showed the cars that were received and accepted. (*Id.*) As further evidence of Zeta's use of the Grand Prairie Yard, Zeta produced Union Pacific Demurrage, Storage and Constructive Placement records which were submitted in the *Zeta v. Osterman Trading* litigation. (DiSabato Cert., Ex. D).

On the other hand, Equistar points to the deposition testimony of Alfred Teo ("Teo") the Chief Executive Officer of Zeta. Teo testified at deposition that he did not approve payment for resin until the plant manager or resin handler sent a receiver which indicated that the resin was at the plant. (Def. Opp., Ex. F at pp. 52–53). Equistar has also supplied deposition testimony from Jackowski that suggests that the railcars at the Union Pacific Yard were not completely under Zeta's control:

Q. Is it fair to say that you were directing that these cars be released per the direction you got from management to simply return all shipments to vendors?

A. Actually, on the cars that were at the Union Pacific, I never released them. They just disappeared from my report.

Q. Do you know who made the decision to release them?

A. I—with certainty, no. I presume that the supplying vendor pulled them, because they still could call the UP and have those cars moved off the yard.

Q. But as you said a moment ago, you simply don't know one way or the other who directed those returns?

A. Correct.

(Def. Opp., Ex. I at p. 46).

According to Leanne K. Pease ("Pease"), the Credit Manager for Equistar, Teo called her to request that the railcars of resin be returned; (Pease Cert. at ¶ 24; Def. Opp., Ex. H at p. 44) Teo said that he didn't need the product. (Def. Opp., Ex. H at p. 45). Thereafter, Equistar arranged with Zeta for the return of the resin from the Arlington Facility and Leominster Facility. (Pease Cert. at ¶ 24–30). Equistar also furnished deposition testimony which indicates that at Teo's direction, Michael Grancio ("Grancio") told the plant managers to let resin vendors take the resin. (Def. Opp., Ex. G at p. 20).

### MONETARY TRANSFERS

Zeta calculated that in the ninety day period preceding the bankruptcy filing, payments were made to Equistar totaling $533,220.60 (King Cert., ¶ 6). It made a new value analysis regarding the resin shipments made to Zeta in that same time period and initially concluded that after accounting for resin shipments having a value of $240,284.40, Equistar received preferential payments totaling $292,936.20. After Equistar pointed out that not all of the resin from the third and fourth shipments to the Arlington Facility was re-

turned to it, Zeta gave an additional new value credit of $68,833. (Zeta Reply Memo at p. 16; King Supp. Cert. at ¶ 4, Ex. A). Zeta thus concludes that a net preference of $224,103.20 remains. (King Supp. Cert. at ¶ 5).

However, Equistar contends that summary judgment is not appropriate with regard to the Money Transfers because material issues of fact exist with regard to whether Zeta has properly credited Equistar for all of the resin shipments it made during the preference period, and whether the timing of certain payments it received were within the ordinary course of business between it and Zeta. Finally, Equistar also observes that if Zeta persuades this Court to set aside the Resin Transfers, that result will create additional new value credits which will eliminate any liability it could have for payments it received within the preference period.

The Court agrees with Equistar that there are material issues of fact regarding the Money Transfers. Equistar provides documentation which suggests that Zeta received a shipment of 176,950 pounds of resin at its Kingman, Arizona plant ("Kingman Facility") on March 1, 2000. (Pease Cert. at ¶ 12; Def. Opp., Ex. D–1). Equistar's records do not reflect payment for the resin and Zeta does not account for it in its new value analysis. Zeta disputes that it ever received the shipment. Plainly, this creates a fact issue.

Equistar also asserts that three payments totaling $62,060.90 were payments made in the ordinary course of both parties. On January 31, 2000 Equistar received a Zeta check dated January 19, 2000 for $24,494.50 in payment of an adjusted November 11, 1999 invoice. (Pease Cert. at ¶ 19; Def. Opp., Ex. O–1). On February 3, 2000 Equistar received a Zeta check dated January 7, 2000 for $18,759.00 in payment of an adjusted November 5,

1999 invoice. (Pease Cert., at ¶ 20; Def. Opp., Ex. O–2). On February 3, 2000 Equistar received a Zeta check dated January 7, 2000 for $17,807.40 in payment of an adjusted invoice dated November 12, 1999. (Pease Cert., at ¶ 21; Def. Opp., Ex. O–3).

Pease has stated that according to Equistar records, in 1999 Zeta made payments to it an average of 99.1 days after the invoice date. (Pease Cert., at ¶ 18). Zeta asserts that in the prepreference period, on average Equistar was paid 102.48 days after the invoice date, and the three payments at issue were made 81, 90 and 83 days after the invoice date. (King Cert., at ¶ 7, Ex. D). Equistar contends that the fact that these three payments were received sooner than the average of 102.48 days suggests that the payments were made in the ordinary course of business between Zeta and Equistar. Equistar further points to Teo's testimony that although the Equistar terms were generally 60 days, Zeta sometimes paid 75 to 80 days late:

Q. Are you familiar with an individual by the name of Leanne Pease?

A. Yes.

Q. Can you identify who she is?

A. Leanne is the Credit Manager, from what I understand, of Equistar.

Q. Have you ever had any dealings with her either personally, by telephone or in writing?

A. Yes. Many Times.

Q. Can you tell me what, generally, the nature of those dealings were related to?

A. Because of the late payment of Zeta Consumer Products.

Q. Would that have been other any particular period of time or closer to filing?

A. I think it was over—I think it was starting about six months prior to the filing. Zeta was falling behind on payment. We have 60 day term with Equistar. But from time to time they take 75 day, 80 day to pay. I usually get a call from Leanne when there was late payment. She's a good credit Manager. She covers everything. I usually will tell her cash flow little bit tight, just be patient with me. Sometimes she work with me.

Q. Usually or sometimes?

A. Usually.

Def. Opp., Ex. F. pp. 163–64.

Finally, Equistar also supplied deposition testimony and certifications from other preference actions involving Resin Transfers which indicate that the days to pay ranged between 90 an 120 days. (Def. Opp., Exs. N & P).

### INSOLVENCY

As a general defense to both categories of transfers, Equistar contends that Zeta has failed to establish it was insolvent at the time the Resin Transfers and the Monetary Transfers were made. Equistar points to an April 19, 2000 letter from Teo. The letter was addressed to GE Capital Commercial Finance, Inc., Zeta's secured lender (the "GE Letter"). In that letter, Teo indicated that as of April 19, 2000, Zeta's total liquid assets were $35.1 million, based on inventory valued at $19.6 million and current accounts receivable valued at $15.5 million. Teo also indicated that as of April 19, 2000, Zeta's liabilities were $31.6 million, based on the GE Capital loan of $16.3 million and the accounts payable of $15.3 million. Using the figures provided by Teo, Zeta's assets would have exceeded its liabilities by $3.4 million just six days before the filing of the bankruptcy petition.

Equistar also proffered a May 23, 1996 appraisal by Norman Levy Associates, Inc. ("Levy Appraisal") and a Special Purpose Audited Statement of Tangible Net Assets for Tucker Housewares, Inc. Prepared by Ernst & Young LLP and dated July 14, 1996 ("E & Y Report"). (Def.Opp., Ex. S.). The Levy Appraisal states an orderly liquidation value of $41,733,450 for certain machinery and equipment located at the Zeta facilities in Leominster, Massachusetts, Kingman, Arizona, and Arlington, Texas. (*Id.*). The E & Y Report reflects that as of June 14, 1996 the Tangible Net Assets for Tucker Housewares, Inc. were $98,234,000.[1] (*Id.*).

Equistar also introduced the deposition testimony of Teo, which was taken in a related adversary proceeding in this case. During that deposition, Teo testified that Zeta was not insolvent during the Preference Period. In fact, Teo testified that what precipitated Zeta's Chapter 11 filing was a severe cash flow problem which Zeta experienced after its secured lender changed the terms of its revolving credit facility. (Def. Opp., Ex. F at pgs. 8–9, 19–20, 99–107). Teo also testified that in the period immediately preceding the bankruptcy filing, he was actively negotiating with several different parties for the sale of certain of Zeta's assets. (*Id.* at pgs. 160–63). Teo testified that he had received a $28.5 million offer for the sale of Zeta's Leominister Facility. He also testified that he anticipated receiving an offer from another party who was interested in purchasing both the Leominister and Kingman facilities. Teo indicated that in the preliminary discussions he had with this buyer, they had agreed on a purchase price of between $80–100 million for those two operations. (See *id.*) Teo also stated that he was personally willing to bid $18–20 million for the Macomb Ill. facility. (*Id.* at 160, 162–63).

To establish that it was in fact insolvent during the Preference Period, Zeta proffered the Certification of Timothy King ("King"), the Accountant to the Creditors' Committee. King analyzed Zeta's October 1999 audited financial statement. According to King's analysis, the financial statement showed that Zeta had total assets of $87,805,000 and total liabilities of $118,229,000, or a negative net worth in excess of $30,000,000 as of October 31, 1999. (King Cert. at ¶ 4). In addition, King reviewed the schedules of assets and liabilities prepared by Zeta in support of its Chapter 11 petition. The schedules valued Zeta's personal property at $42.7 million and listed liabilities of $91 million as of April 25, 2000. King included an additional $28.4 million in his analysis, which reflected the value of real property assets that were liquidated post-petition. (King Cert. at ¶ 5). According to King's analysis of the schedules, as of April 25, 2000, Zeta's total assets were valued at $71.1 million with liabilities of $91 million, or a negative net worth of approximately $20 million on the petition date. (King Cert. at ¶¶ 4–5). King, however, testified during his deposition in this proceeding that he did not review any of the underlying assumptions that were used by the accounting firm that prepared Zeta's October 1999 financial statement and he took no part in preparing Zeta's schedules, nor did he speak with any of Zeta's employees or representatives to determine how Zeta calculated its assets or liabilities in preparing those schedules. (Def. Opp., Ex. R at pgs. 18–27).

## DISCUSSION

### SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure, made applicable to this adver-

---

**1.** Zeta acquired Tucker Housewares, Inc. from Mobil Corp. in 1996.

**346**

sary proceeding by Bankruptcy Rule 7056 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed R Civ. P. 56(c). The party seeking summary judgment under Rule 56 bears the initial burden of identifying evidence that demonstrates the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). There is no genuine issue for trial when the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *See id.*

Inferences drawn from the underlying facts will be viewed in the light most favorable to the non-moving party. *See Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. However, the existence of a material factual dispute is sufficient to prevent summary judgment only if the disputed fact is determinative of the outcome under applicable law. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505 ("the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.").

The non-moving party "must do more than simply show that there is some metaphysical doubt as to a material fact." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. Instead, the non-moving party must establish the existence of each element on which it bears the burden of proof. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. However, "... where the non-moving party's evidence contradicts the movant's, then the nonmovant's must be taken as true." *Big Apple BMW, Inc. v. BMW of North America, Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992). Importantly, in deciding a summary judgment motion the court's role is not to resolve disputed issues of fact or to make credibility determinations. *Id.* at 1362–63. "In practical terms, if the opponent has exceeded the 'mere scintilla' threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent." *Id.* at 1363.

### ELEMENTS FOR A PREFERENCE UNDER 11 U.S.C. § 547(b)

■■■ Section 547(b) authorizes a Trustee or debtor-in-possession to avoid a transfer of an interest of the debtor in property: (1) to or for the benefit of a creditor; (2) for or on account of an antecedent debt owed by the debtor before the transfer was made; (3) made while the debtor was insolvent; (4) on or within 90 days before the date of the filing of the bankruptcy petition; (5) that enables such creditor to receive more than such creditor would have received if the debtor liquidated under Chapter 7 of the Bankruptcy Code. *See* 11 U.S.C. § 547(b); *Travellers Int'l AG v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.)*, 134 F.3d 188, 191, n. 1 (3d Cir.1998); *Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.)*, 78 F.3d 30, 34 (2d Cir.1996). All five elements must be established by the trust-

ee or debtor-in-possession in order to recover a preference. *See* 11 U.S.C. § 547(g); *In re Roblin Indus., Inc.*, 78 F.3d at 34. If the trustee fails to prove all five elements, a preference has not been established. *See Harvey v. Orix Credit Alliance, Inc. (In re Lamar Haddox Contractor, Inc.)* 40 F.3d 118, 122 (5th Cir. 1994). Additionally, if the creditor proves the existence of any of the exceptions set forth in § 547(c) the transfer cannot be avoided.

### ZETA'S INSOLVENCY

 To prevail on its motion, Zeta must prove that it was insolvent when the transfers were made. A debtor is "insolvent" when its liabilities exceed its assets, based on a fair valuation. *See* 11 U.S.C. § 101(32)(A); *In re Lamar Haddox*, 40 F.3d at 121; *In re F.H.L. Inc.*, 91 B.R. 288, 294 (Bankr.D.N.J.1988). The debtor is presumed insolvent during the 90 days immediately preceding the date of the filing of the petition. (the Preference Period). *See* 11 U.S.C. § 547(f). The presumption will suffice to prove insolvency during the Preference Period if the creditor does not present some evidence showing that the debtor was solvent during that time. If the creditor comes forward with some evidence of solvency, the trustee or debtor-in-possession loses the benefit of the presumption and must prove the debtor's insolvency by a preponderance of the evidence. *See Clay v. Traders Bank of Kansas City*, 708 F.2d 1347, 1351 (8th Cir. 1983) (presumption affords initial benefit but ultimate burden remains on trustee to prove insolvency); *In re Total Technical Servs., Inc.*, 150 B.R. 893, 899 (Bankr. D.Del.1993) (same).

 The determination of Zeta's insolvency is a question of fact. *See Klein v. Tabatchnick*, 610 F.2d 1043, 1048 (2d Cir. 1979). In the context of a corporate debt-or, fair value is determined "by estimating what the debtor's assets would realize if sold in a prudent manner in current market conditions." *In re Pembroke Dev. Corp.*, 124 B.R. 398, 401 (Bankr.S.D.Fla. 1991) (citing *In re F & S Central Mfg. Corp.*, 53 B.R. 842 (Bankr.E.D.N.Y.1985)); *see also In re Trans World Airlines*, 134 F.3d at 193 (courts should look to the "market value" of assets that can be realized in a reasonable time).

 As the case authority notes, in many cases, fair valuation may not be reflected in the values assigned those assets on a financial balance sheet. Generally, financial statements and balance sheets reflect the book values of assets, which is usually the cost of the asset reduced by any depreciation. *See In re Lamar Haddox*, 40 F.3d at 121. Book value ordinarily does not reflect the true market value of the asset. *In re Roblin Indus.*, 78 F.3d at 36. Nevertheless, while book value may understate or fail to reflect the fair value of a debtor's assets, it provides some competent evidence as to insolvency and forms a starting point for purposes of the insolvency analysis. *See In re Trans World Airlines*, 180 B.R. 389, 405 (Bankr.D.Del. 1994).

 The better approach, when possible, is to base the determination of insolvency on some form of seasonal appraisal of the assets. *See, e.g., In re Roblin Indus.*, 78 F.3d at 38; *In re Lamar Haddox*, 40 F.3d at 121–22. Although appraisals are not the exclusive or dispositive means for determining fair value, they do afford a court a more accurate snapshot of the market value of those assets at the time and under the circumstances when a debtor files in bankruptcy. *See, e.g., In re Roblin Indus.*, 78 F.3d at 38 (opining that appraisal is the better approach to determine fair valuation).

■ Guided by the authority set forth above, the Court finds that a genuine issue of fact exists as to the insolvency of Zeta at the time of the transfers. While the Levy Appraisal and the E & Y Report may be subject to attack based on the age of the reports and some of the underlying assumptions, nonetheless when coupled with the GE Letter and Teo's deposition testimony they give rise to a genuine issue of material fact. From the record before the Court it appears that Teo, as Chief Executive of Zeta, had personal knowledge of Zeta's operations as of April 19, 2000. Teo testified that he was directly involved in the negotiations with prospective purchasers and that he had extensive experience in the resin industry. The Court believes it is reasonable to conclude that he is competent to render his opinion on the proper valuation of Zeta's property. *See* Fed.R.Evid. 701; *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1174–76 (3d Cir.1993). On a motion for summary judgment this Court cannot assess the credibility of either Teo or King, and certainly cannot weigh the sufficiency of the evidence marshaled by either side. *See, Big Apple BMW*, 974 F.2d at 1363.

### EQUISTAR'S DEFENSES

#### Debtor's Receipt of Resin at the Grand Prairie Yard

■ Equistar correctly observes that § 547(e)(3) states that a transfer is not made until the debtor has acquired rights in the property transferred. It contends that because the First and Second Shipments to the Arlington Facility were not received at the rail siding at the Arlington Facility that Zeta was not in actual physical possession of the property and thus did not have a property interest in the resin such that a transfer occurred when the First and Second Shipments were released from the Union Pacific Grand Prairie Yard.

To support its argument, Equistar points to the deposition testimony of Teo. Teo testified that Zeta's payment practices required a railcar to be physically located at the railside of one of Zeta's facilities before it was considered received for purposes of triggering payment on the invoice for that shipment. Equistar contends that this testimony confirms that the railcars stored in the Grand Prairie Yard were never received. Additionally, Equistar points to Jackowski's deposition testimony that suggests that the resin vendors could simply recall the railcars from the Grand Prairie Yard. Finally, Equistar maintains that it issued a demand to the railroad for the return of the stored railcars, and the railcars were returned directly from the Grand Prairie Yard to Equistar with Zeta's knowledge and consent.

Zeta counters Equistar's contention by pointing to the certification and deposition testimony of Jackowski, that the resin was being held at the Grand Prairie Yard for the benefit of Zeta, and that the cars could be moved to the Arlington Facility at any time without the need for additional approvals or clearances by the seller. Further, Zeta provides documents showing that it paid the monthly demurrage charges for storage of the cars until Zeta needed to move them to the Arlington Facility railside.

Based on its version of the facts Zeta argues that it had constructive possession of the First and Second Shipment and thus had a sufficient property interest for the return of the railcars to constitute a transfer of its property. Zeta notes that several cases have determined that receipt of goods may occur by constructive possession rather than actual physical possession. *See Montello Oil Corp. v. Marin Motor Oil, Inc. (In re Marin Motor Oil, Inc.)*, 740 F.2d 220, 225 (3d Cir.1984) (buyer had

constructive possession of goods that were in actual possession of buyer's bailee); *Haywin Textile Products, Inc. v. Bill's Dollar Stores, Inc. (In re Bill's Dollar Stores Inc.)*, 164 B.R. 471, 475–76 (Bankr. D.Del.1994) (goods left in common carrier's trailers at buyer's warehouse were "received"); *In re Video King of Illinois, Inc.*, 100 B.R. 1008 (Bankr.N.D.Ill.1989).

In *Marin*, a seller hired a commercial barge to deliver a shipment of gasoline to the buyer. The barge operator loaded the gasoline at the seller's terminal and transported it to a terminal where the buyer had storage rights. The barge arrived at the bailee's terminal and the gasoline was unloaded into the storage facility the next day. The *Marin* court concluded that the date of "receipt" of the gasoline by the buyer was the day the buyer's bailee took physical possession by allowing the gasoline to be off-loaded by the seller's carrier. *See Marin*, 740 F.2d at 225–26.

In reaching its decision, the *Marin* court focused on the complimentary rights of a seller to (a) either stop delivery by a carrier, or (b) bring an action to reclaim the goods from the buyer. The *Marin* court explained that the right to reclamation under UCC § 2.702 arises when the buyer "receives" the goods. The court explained that this right arises when the seller no longer has the right to order the carrier to stop delivery. The court reasoned that while the gasoline was in the physical possession of the carrier, the seller's only remedy was to stop delivery, but once the gasoline was in the possession of the buyer's bailee, the seller's right to stop delivery was extinguished and the only remedy open to the seller was its right to reclamation. *See id.*

The Court is persuaded that the *Marin* analysis of these complimentary rights controls here. However, the contradictory facts before the Court, particularly the contradictory deposition testimony of Jackowski and Teo, raises a genuine issue of material fact as to whether the two railcars stored at the Grand Prairie Yard were in Zeta's constructive possession, thereby cutting off the rights of Equistar to stop delivery. The issue will need to be resolved at trial.

### Equistar's Claim of Reclamation

In the alternative, Equistar advances a seller's right to reclamation as an independent legal theory in opposition to Zeta's motion for summary judgment. Equistar asserts that pursuant to Section 2.702(2) of the UCC,[2] it was entitled to reclaim the resin from Zeta and that it in fact successfully reclaimed the resin prior to Zeta's bankruptcy filing. It concludes that because it successfully reclaimed pre-petition, the UCC is the controlling law. Section 2.702(2) provides:

> Where the seller discovers that the buyer had received goods on credit while insolvent, the seller may reclaim the goods upon demand within 10 days after the receipt, but if misrepresentation of solvency has been made to the particular seller in writing within three months before delivery, the 10 day limitation does not apply. Except as provided in this subsection the seller may not base a right to reclaim goods on the buyer's fraudulent or innocent misrepresentation of solvency or of intent to pay.

UCC § 2.702(2).

Zeta contends that § 546(c) of the Bankruptcy Code is the exclusive remedy for a

---

2. In addressing the relevant UCC code provisions contained in this opinion, the Court notes that both Texas and New Jersey have adopted and codified the relevant provisions of the UCC in identical form. Accordingly, the Court will refer to those provisions with the UCC numeric rather than referencing the particular state's statutory commercial code numeric.

reclaiming seller when a bankruptcy case exists. As such, Zeta argues that Equistar's reclamation defense must fail because Equistar failed to comply with the Bankruptcy Code's statutory requirement of a written demand. Section 546(c) provides:

Except as provided in subsection (d) of this section, the rights and powers of a trustee under sections 544(a), 545, 547, and 549 of this title are subject to any statutory or common law right of a seller of goods that has sold goods to a debtor, in the ordinary course of such seller's business, to reclaim such goods if the debtor has received such goods while insolvent, but .... (1) such a seller may not reclaim any such goods unless such seller demands in writing reclamation of such goods before ten days after receipt of such goods by the debtor ...

11 U.S.C. § 546(c) (1994).

■■■■ It is well recognized that § 546(c) does not create an independent right to reclamation for vendors of goods sold to insolvent buyers, it merely recognizes that such a right exists to a limited degree in a bankruptcy case, provided that such a right exists either under common law or under state statute. *See, In re Dynamic Technologies Corp.*, 106 B.R. 994, 1003 (Bankr.D.Minn.1989). The trustee or debtor-in-possession may not attempt to avoid a valid statutory right of reclamation where the seller shows (i) the sale to the buyer was in the ordinary course of business; (ii) the buyer received the goods while insolvent; (iii) the seller demanded reclamation of the goods within 10 days after the buyer received the goods; (iv) the demand was in writing; and (v) the buyer still has possession of the goods. *See* 11 U.S.C. § 546(c). In the context of a bankruptcy proceeding, only a written demand will suffice to preserve the seller's immunity from the trustee's avoiding powers. *See, e.g., In re Hechinger Investment*

*Co. of Delaware, Inc.*, 274 B.R. 402, 405 (Bankr.D.Del.2001); *In re Video King, Inc.*, 100 B.R. 1008, 1013 (Bankr.N.D.Ill. 1989).

■■■■ Despite the overwhelming weight of authority that recognizes that a seller's right to reclamation under § 2.702 of the UCC is effective in a bankruptcy proceeding only to the extent provided for in § 546(c), *see, e.g., Oakland Gin Co., Inc. v. Marlow (In re Julien Co.)*, 44 F.3d 426, 432 (6th Cir.1995); *Flav O Rich, Inc. v. Rawson Food Service, Inc. (In re Rawson Food Service, Inc.)*, 846 F.2d 1343, 1347 (11th Cir.1988); *In re Dynamic Technologies*, 106 B.R. at 1003 (collecting cases), Equistar insists that § 546 is inapplicable in this case. Equistar argues that the requirements of a written demand contained in § 546 only applies to sellers who are attempting to reclaim goods post-petition. Equistar claims that where the seller has successfully reclaimed its goods before the buyer files its bankruptcy petition § 546 is inapplicable and instead UCC § 2.702(2) controls.

This Court disagrees with Equistar's contention and finds persuasive the analysis performed by the court in *Julien Co.*, which addressed this very argument. Though the factual and procedural history of *Julien* are somewhat different, the issue presented is the same, and the case is therefore directly applicable. In that matter Oakland Gin Co., Inc. ("Oakland") sold bales of cotton to Julien. 44 F.3d at 428. The cotton was delivered to a Julien warehouse operated by Federal Compress and Warehouse Company, Inc. ("Federal"), and Oakland thereafter presented the Julien drafts and bills of lading to Julien's bank for payment. *Id.* After the drafts were dishonored, Oakland orally demanded that Federal return the cotton. Rather than turn over the cotton, Federal filed an interpleader action in state court to deter-

mine title to the cotton. *Id.* Shortly thereafter, Julien filed its petition in bankruptcy and a trustee was appointed. The trustee then filed a complaint asserting the estate's superior title. *Id.* Among its defenses to the trustee's complaint Oakland contended that because the interpleader suit was filed prior to bankruptcy, UCC § 2.702–2 rather than Bankruptcy Code § 546(c) governed the transaction. *Id.* at 432. Oakland argued that the bankruptcy court and district court erred in applying the requirements contained in § 546(c) to a creditor when the creditor has satisfied the statutory requirements of UCC § 2.702 prior to the buyer's bankruptcy filing. *Id.*

Although the Sixth Circuit acknowledged the existence of a minority position which favored Oakland's view, it observed that the overwhelming majority of courts view § 546(c) as the exclusive remedy for a reclaiming seller, and that they do so because of the underlying purpose of § 546(c). 44 F.3d at 432. It stated that

> With the passage of U.C.C. § 2–702, many courts were confused when and how a creditor's right to reclaim under the U.C.C. coincides with the bankruptcy trustee's right to the property. *Section 546(c)* attempted to resolve this dilemma by making it clear that the right of reclamation is valid although bankruptcy intervenes. However, it specifies the precise conditions under which the right will be recognized.
>
> The language of *§ 546(c)* also supports this interpretation. It states that the trustee's power in bankruptcy are subject to the seller's statutory or common law right to reclamation but only as long as the seller satisfies certain conditions. By its own terms then, *§ 546(c)* governs here.

*Id.* (Citation omitted).

As additional support for the conclusion that § 546 is Equistar's exclusive remedy

for reclamation, the Court notes the decision in *In re M.P.G., Inc.,* 222 B.R. 862 (Bankr.W.D.Ark.1998). There, the seller sold the debtor utility materials on credit. Approximately five days after receipt, the seller contacted the debtor by telephone and demanded immediate payment. When the debtor refused, the seller made another oral demand for the immediate return of all the materials. The debtor refused to return the materials, and approximately six weeks later, the seller successfully repossessed a portion of the goods sold to the debtor. The debtor filed for bankruptcy protection approximately one month after the seller's successful reclamation. *See M.P.G.,* 222 B.R. at 863.

The Chapter 11 trustee then brought an adversary proceeding to avoid, as a preferential transfer, the seller's pre-petition exercise of its right of reclamation under Arkansas UCC § 2.702. The *M.P.G.* court ruled in favor of the trustee finding that the seller's pre-petition reclamation was ineffective because the seller failed to comply with the written demand requirement contained in 11 U.S.C. § 546(c). *See id.* at 865. The *M.P.G.* court explained that, as a consequence of not having satisfied the requirement of a written demand, the seller was denied the shield of immunity from the trustee's attempt to avoid the reclamation as an illegal preference. *See id.* (citing 2 David G. Epstein et al., BANKRUPTCY § 6065 at 149–50 (1992)).

The Court is persuaded that § 546(c) was Equistar's exclusive remedy for reclaiming the resin shipped to the Arlington Facility and the Leominster Facility. Unless it can produce evidence of compliance with the requirements of § 546(c), its assertion that it effected a reclamation of the resin is unavailing.

### *Equistar's Claim of Rescission*

Equistar also argues that the return of the resin cannot be disturbed because, un-

der the common law, the parties had a right to equitably rescind the contract. In essence, Equistar argues that 11 U.S.C. § 546(c) recognizes such common law remedies and a successful reclamation prepetition cannot be disturbed even if a seller did not comply with the formal requirements of § 546. It suggests that upon rescission, title to the resin passed to Equistar, and therefore the subsequent return of the resin was not a transfer of property of Zeta and cannot be avoided as a preference.

■■■■ The Court views this argument as nothing more that a disguised reclamation remedy. *See, e.g., Dynamic Technologies,* 106 B.R. at 1006 (finding that common law cause of action for rescission was nothing more than a "masquerading reclamation claim"). As explained above, § 546(c) provides the exclusive remedy for a reclaiming seller in bankruptcy. Consequently, this defense must also fail. Moreover, Equistar's argument ignores the last sentence of UCC § 2.702, as adopted in Texas and New Jersey, that reclamation under § 2.702 is the exclusive non-bankruptcy remedy for a reclaiming seller who is basing its reclamation on the insolvency of its buyer. By enacting the current version of the UCC, Texas and New Jersey have abrogated the seller's right to advance the legal theory of equitable rescission. *See* Tex. Bus. & Comm.Code § 2.702(c); N.J.S.A. 12A:2–702(3). Further support for this finding is contained in the UCC's Official Comment which provides:

> Because the right of the seller to reclaim goods under this section constitutes preferential treatment as against the buyer's other creditors, Subsection (3) provides that such reclamation bars all his other remedies.

U.C.C. § 2.702 cmt. 3.

The above analysis, however, does not completely answer the question. Equistar's briefs are unclear as to which party it contends invoked the right of rescission. Although it is clear from the statute that a seller cannot base its reclamation claim on a theory of rescission, UCC § 2.702 does not address the question of whether a buyer can assert rescission to undo a transaction. If Equistar is claiming that Zeta was the actual party that sought rescission, as evidenced by the return of the resin, then arguably § 2.702 would not apply to preclude a buyer from invoking such a remedy.

■■■■ The UCC, as enacted in Texas and New Jersey, does not expressly codify a buyer's common law right to equitable rescission. Instead, the UCC substitutes a buyer's right to reject or revoke acceptance and crafts remedies under these provisions similar to the remedies available under equitable rescission. *See, e.g.,* UCC § 2.602 (buyer's right to reject goods); UCC § 2.608 (buyer's right to revoke acceptance). In addressing the issue of whether a buyer's right to rescind survived after enactment of the UCC, the courts of Texas and New Jersey have found that the relief incorporated in the revocation of acceptance provision contained in § 2.608 of the UCC is intended to provide a buyer the same relief as the common law remedy of equitable rescission. *See Ramirez v. Autosport,* 88 N.J. 277, 288, 440 A.2d 1345 (1982); *Carrow v. Bayliner Marine Corp.,* 781 S.W.2d 691, 695 (Tex.App.1989). Thus, a buyer must comply with the statutory requirements of § 2.608 in order to cancel a contract for the sale of goods.

Accordingly, the Court finds that both Texas and New Jersey, through the adoption of the UCC, have abrogated a seller's right to reclaim goods sold on credit based on the common law remedy of rescission, where rescission and reclamation are based on the misrepresentation of solvency

by a buyer. Consequently, rescission can not serve as a shield to prevent avoidance of these transfers. Further, the Court finds that a buyer's right to rescission has been codified in § 2.608 of the Uniform Commercial Code by both Texas and New Jersey, and therefore a buyer cannot raise the legal theory of rescission as an independent basis for relief in a contract for the sale of goods. Thus, Equistar is precluded from raising the defense of equitable rescission at trial, either directly or derivatively.

### Equistar's Claims that Debtor Rejected and/or Revoked its Acceptance

Finally, to shield the Resin Transfers from avoidance, Equistar advances two alternative legal theories that are generally the province of a buyer attempting to avoid a contract for the sale of goods under the UCC. Equistar claims that Zeta either (a) rejected the resin, or (b) revoked its acceptance of the resin, and that upon either of these occurrences title in the resin reverted to Equistar, and the resin was no longer property of Zeta. It thus reasons that the Resin Transfers are not subject to avoidance. As support for this assertion Equistar points to UCC § 2.401(4) which states:

> A rejection or other refusal by the buyer to receive or retain the goods, whether or not justified, or a justified revocation of acceptance revests title to the goods in the seller. Such revesting occurs by operation of law and is not a "sale".

UCC § 2.401(4).

Zeta vigorously disputes that these defenses have any merit in this case. Zeta contends that a buyer can only raise the self-help remedies of rejection or revocation of acceptance when the buyer is attempting to reject or revoke its acceptance of non-conforming goods. Since both parties agree that the returned resin conformed to the contract, Zeta asserts that no rejection or revocation of acceptance

occurred, and that 2.401(4) is inapplicable on the facts before the Court. Accordingly, Zeta asserts that the Court can simply ignore these defenses as inappropriate in this preference avoidance action.

Equistar, of course, disagrees. Equistar does not dispute that the returned resin conformed to the contract. Rather, Equistar claims that a buyer can reject conforming goods, and such a rejection, although unjustified and normally deemed a breach by a buyer, is nevertheless effective when the buyer follows the statutory procedures detailed in § 2.602 of the UCC. In support for its assertion that Zeta effectively rejected the resin, Equistar points to the deposition testimony of Ms. Pease. During her deposition Pease testified that Teo told her that Zeta returned the resin because it didn't need it. Equistar claims that Teo's statements to Peace were a timely and effective notice of rejection that complied with UCC § 2.602.

The Court is inclined to agree with the legal analysis advanced by Equistar, and finds that whether Zeta rejected conforming goods is a question of fact which must be resolved at trial. The UCC contains two separate but overlapping provisions, § 2.602 dealing with rejection by a buyer, and section 2.606 dealing with acceptance by a buyer. Under the UCC, acceptance occurs when the buyer takes any one of the following steps: (a) signifies his acceptance; (b) fails to make an effective rejection; or (c) does any act inconsistent with the seller's ownership. *See* UCC § 2.606(1). Section 2.602 of the UCC governs the right of a buyer to reject goods. Section 2.602 provides:

> Rejection of goods must be within a reasonable time after their delivery or tender. It is ineffective unless the buyer seasonably notifies the seller.

UCC § 2.602(1).

The overlap of these two UCC sections requires a court to view and ana-

lyze the section on rejection through the prism of acceptance. When read together, the sections demonstrate that an effective rejection must occur before acceptance. Effective rejection requires a buyer: (i) to give seasonable notice of the rejection to the seller; and (ii) the notice must be given within a reasonable time after delivery. If the buyer fails with respect to either of these affirmative duties, he is deemed to have accepted the goods. *See* UCC § 606(1)(b); *HCI Chemicals (USA), Inc. v. Henkel KGaA,* 966 F.2d 1018 (5th Cir.1992) (applying Texas UCC); *In re Wild Lilly, Inc.,* 51 B.R. 963, 965 (Bankr. S.D.N.Y.1985). Under the UCC, notice of rejection must be clear and unambiguous so that there is no doubt left in the seller's mind that the buyer will not retain the goods under any circumstances. *See HCI Chemicals,* 966 F.2d at 1023–25. The notice, however, need not be in writing as courts [3] recognize that oral notice of rejection will suffice. *See Western Conference Resorts, Inc. v. Pease,* 668 P.2d 973 (Colo. App.1983) (oral notice sufficient); *National Fleet Supply, Inc. v. Fairchild,* 450 N.E.2d 1015 (Ind.App.1983) (same), *vacated in part on other grounds by Mitchell v. Mitchell,* 695 N.E.2d 920 (Ind.1998).

 The disagreement between the parties on this issue crystallizes the distinction contained in section 401(4) of the UCC between a wrongful or unjustified rejection and an ineffective rejection. As the Second Circuit explained:

The basic principle is that the buyer may make a procedurally "effective" rejection of goods it purchased, even though such a rejection is substantively wrongful. "Wrongful" refers to a rejection of conforming goods, whereas an "effective" rejection is timely and indi-

cates the buyer has satisfied the procedural obligations attendant upon his rejection.

*Integrated Circuits Unlimited v. E.F. Johnson Co.,* 875 F.2d 1040, 1042 (2d Cir. 1989) (quoting 1 White & Summers, *Uniform Commercial Code,* 314 (2d ed.1980)).

 It follows that when a buyer timely rejects conforming goods by giving the seller the statutorily required notice of the rejection, then that rejection will be effective, even though wrongful. Such a rejection is deemed non-acceptance by the buyer. Upon an effective, albeit wrongful rejection, title revests in the seller by operation of law, pursuant to section 2.401(4). Thus, if the buyer returns the goods to the seller after an effective, but wrongful rejection, the seller receives nothing more than its own goods upon transfer. *See, e.g., In re Pacific Exp., Inc.,* 780 F.2d 1482, 1488–89 (9th Cir.1986) (finding that debtor's pre-petition rejection of telecommunications equipment delivered to it before it filed for bankruptcy caused title to the equipment to revert to seller pursuant to UCC § 2.401(4), and seller was entitled to the equipment's return).

 The issue of effective rejection is a question of fact, and the present record is simply too sparse to allow the Court to draw a conclusion as to whether Zeta timely and unequivocally rejected the resin. The evidence also must establish that, if the rejection was procedurally effective, it applied to all the returned resin. As explained above, a buyer is deemed to have accepted goods where the buyer takes any action inconsistent with the seller's ownership. *See* UCC § 2.606(1)(c). Comment 4 to UCC § 606 refers to such act as:

---

**3.** Since the UCC has been adopted in all 50 states, the Court can rely on decisions from other states that are relevant in interpreting identical UCC Code sections. *See In re Edison Brothers Stores,* 207 B.R. 801, 809, n. 7 (Bankr.D.Del.1997).

"[A]ny action taken by the buyer, which is inconsistent with his claim that he has rejected the goods, constitutes an acceptance." It is plausible that upon a showing that the rejection was effective, the rejection would apply to the unopened railcars returned to Equistar from either Zeta facility or stored at the Grand Prairie Yard. Conversely, it is illogical for the Court to assume that the unused resin returned from the opened railcars was effectively rejected. The continued use of this resin by Zeta would seem to constitute an act inconsistent with Equistar's ownership. *See, e.g., J.L. Clark Mfg. Co. v. Gold Bond Pharm. Corp.*, 669 F.Supp. 40, 42 (D.R.I. 1987) (applying identical provisions of Pennsylvania's UCC, the court held that the continued use of goods after buyer rejected constituted an acceptance). Section 2.606(2) of the UCC provides that acceptance of part of a commercial unit constitutes acceptance of the entire unit.

### Revocation of Acceptance under the UCC

Initially, the Court notes that UCC § 401(4) only applies to a *justified* revocation of acceptance by a buyer. *See* UCC § 401(4). There are four elements that must be established for a proper revocation of acceptance under UCC § 2.608. In order for a buyer to revoke its acceptance it must show: (1) that the nonconformity with the contract substantially impairs the value of the goods to buyer; (2) the buyer's acceptance was (a) given on the reasonable assumption that the nonconformity would be cured (when discovered at time of acceptance) or (b) reasonably induced by the difficulty of the discovery or by the seller's assurances when discovery of the defect occurred after acceptance that the seller would cure; (3) revocation occurred within a reasonable time after the nonconformity was discovered or should have been discovered; and (4) revocation took place before a substantial change occurred in the condition of the goods not caused by their own defects. *See* UCC § 2.608.

Revocation is not warranted unless there has been a *substantial impairment of value* of the goods to the buyer. *See Herbstman v. Eastman Kodak Co.*, 68 N.J. 1, 9, 342 A.2d 181 (1975) (emphasis added). A buyer has the burden to prove that revocation of acceptance was proper and justified, including proof that the defects or nonconformity caused a substantial impairment in the value of the goods. *See G.M. Motors v. Jankowitz*, 216 N.J.Super. 313, 523 A.2d 695 (A.D.1987).

Equistar has failed to point the Court to anything in the record that indicates that Zeta revoked its acceptance. As explained above, the evidence actually points to a contrary result. There is no contention that the resin was nonconforming. Indeed, Zeta used some of the resin and returned only that portion that remained unused. Without some evidence that Zeta complained to Equistar that the resin was defective or non-conforming, and that it conditionally accepted the resin on the assumption that the defect or nonconformity would be cured, the use of the resin without any complaint is inconsistent with a finding that Zeta revoked its acceptance. Accordingly, the Court finds that Equistar has done no more that state a conclusory and unsupported allegation of revocation.

### Equistar's Ordinary Course Defense

Equistar claims that the Monetary Transfers should be excepted from avoidance under § 547(c)(2). In order to establish an ordinary course defense, the creditor must show that: (a) the debt was incurred by the debtor in the ordinary course of business between the debtor and the transferee; (b) the payment was made

in the ordinary course of the business or financial affairs of the debtor and the transferee; and (c) the payment was made according to ordinary business terms used in the industry in which the debtor and transferee operate. *See* 11 U.S.C. § 547(c)(2). Combining the first two elements, the creditor must establish that the debt was typical to those that existed between the parties and that the corresponding payment was typical of their payment history. Factors which courts examine in determining whether the payments were typical include: "(1) the length of time the parties have engaged in the type of dealing at issue; (2) whether the subject transfer was in an amount more than usually paid; (3) whether the payments were tendered in a manner different from previous payments; (4) whether there appears any unusual action by either the debtor or creditor to collect or pay on the debt; and (5) whether the creditor did anything to gain an advantage in light of the debtor's deteriorating financial condition." *In re First Jersey Securities, Inc.,* 180 F.3d 504, 512 (3d Cir.1999) (citing *In re Parkline Corp.,* 185 B.R. 164, 169 (Bankr.D.N.J.1994)).

█ During the preference period, Zeta issued twelve (12) checks to Equistar in payment of Equistar invoices. Equistar claims that of these payments at least three payments, made 81, 83, and 90 days after the date of Equistar's invoices were made in the ordinary course of business. Zeta claims that none of these payments were made in the ordinary course because it paid Equistar invoices on average 102.81 days after invoice. It therefore concludes that payment made earlier than average are not within the ordinary course of its dealings with Equistar.

Zeta prepared a comparison between past payment history and the timing of the payments during the preference period. (King Cert. at ¶ 7; Ex. D to King Cert.).

That payment history established that during the two years prior to the commencement of the bankruptcy case, Zeta paid Equistar on one hundred ninety-nine invoices (199). The majority of those invoices (65%) were paid between 74 to 104 days after invoice. The median number was 97 days (12 payments) after date on invoice. Teo testified that Equistar generally worked with Zeta on payment of overdue invoices, and nothing in the record supports a finding that Equistar increased its collection efforts during the preference period. It appears that sufficient facts exist to suggest that the parties continued their usual course of business during the preference. The Court finds that three payments made by Zeta 81, 83, and 90 days after the invoice date may well be within the historical payment range between the parties. Accordingly, summary judgment cannot be granted in favor of Zeta on the Monetary Transfers.

### Equistar's Subsequent New Value Defense

█ Both parties submitted a new value analysis allowing Equistar credit for shipments made to Zeta after Equistar received the Monetary Transfers. (Supplemental Cert. of Timothy King at ¶ 4; Ex. A to King Suppl. Cert.; Def. Opp., Ex. D). The Court requested the parties to follow the formula articulated in *In re Thomas Garland, Inc.,* 19 B.R. 920, 926 (Bankr.E.D.Mo.1982). In *Garland,* the court rejected the argument of the debtor-in-possession that § 547(c)(4) should be interpreted to allow a creditor to set off as new value only those transfers provided immediately after one preferential transfer by the debtor and prior to the next preferential transfer. *See id.* Instead, The *Garland* court allowed a creditor to exhaust all new value transfers that were extended to the debtor so long as those new transfers

were made on an unsecured basis. *See Garland,* 19 B.R. at 929.

Despite the parties' best efforts in compiling their data, there still remain several issues in dispute. First, Equistar disputes the right of Zeta to apply certain discounts to unpaid invoices. Zeta contends that these discounts were the result of negotiations between the parties adjusting the price of the shipment. Equistar counters that even if that were the case, these discounts are inappropriate where Zeta never paid the invoice. Further evidence is needed regarding the negotiation of the discounts before this issue can be decided.

Next, the parties dispute one shipment of resin purportedly shipped by Equistar to Zeta's Kingman, Arizona facility. Equistar claims that on or about March 1, 2000, Zeta received a shipment of 176,950 lbs. of resin valued at $61,932.50. Zeta denies receiving such shipment. Equistar has introduced into evidence a bill of lading and tracking report that show that the shipment was sent by Equistar on February 17, 2000, and delivered to Zeta in Kingman, Arizona on March 1, 2000. (Def.Opp., Ex. D 1). Equistar has established a prima facie case that the resin was delivered. Accordingly, Zeta will need to come forward with some evidence at trial supporting its contention of non-delivery. There is also a *genuine* dispute between the parties regarding the amount of resin returned from the Arlington Facility. There appears to be a discrepancy of 40,-000 pounds between what Zeta claims it returned and what Equistar claims it received.

Finally, in the new value analysis submitted to the Court neither party accounts for the returned resin or credited Equistar for the value of those shipments. This is understandable since neither party knows what numbers to apply until the Court determines what amount of returned resin

was actually a preferential transfer. Accordingly, the Court will allow each party to resubmit a new analysis which accounts and assigns value to the returned resin and gives credit for Equistar's shipments at the conclusion of the trial.

### CONCLUSION

For the reasons stated herein, Zeta's motion for summary judgment is denied.